**Gregg, Arthur**

| | |
|---|---|
| **From:** | Ed Martin <edmartin1791@gmail.com> |
| **Sent:** | Wednesday, June 22, 2016 1:55 PM |
| **To:** | Joel Rohlf; Steve Clark |
| **Subject:** | Fwd: CONFIDENTIAL - DRAFT ONLY <Trademark Opinion> |
| **Attachments:** | 00424013.PDF; full.pdf |
| | |
| **Categories:** | Profiled |

fyi

---------- Forwarded message ----------
From: **Ed Martin** <edmartin1791@gmail.com>
Date: Wed, Jun 22, 2016 at 1:53 PM
Subject: CONFIDENTIAL - DRAFT ONLY
To: "Ed Martin, Jr." <edmartin1791@gmail.com>

Exhibit
E



| MEMORANDUM |
|---|

TO:       Ed Martin, Phyllis Schlafly, et al.

                                              ATTORNEY WORK PRODUCT

FROM:    R Emmett McAuliffe

DATE:    June 17, 2016

IN RE:    Inventory and assessment of Phyllis Schlafly's Intellectual Property,
            1965-2016

1.    Main Questions Presented: Can Intellectual Property Law be used as a leverage point
      to force Eagle Forum (the "C4") to cede control of the organization to Mrs. Phyllis
      Schlafly[1] (or in the alternative can the C4 be forced to choose another name)?  What
      right does Eagle Forum Education and Legal Defense Fund have to use the name
      Eagle Forum?

2.    EXECUTIVE SUMMARY:  Intellectual Property Law offers us a substantial number
      of "swords" under these facts.  It is believed that these swords, used together, would
      cause business interruption of the C4 that would threaten its survival. Meanwhile,
      client's road to survival is much less fraught with intellectual property problems. The
      name EAGLE FORUM has a "shield" though, called incontestability. Client has
      sufficient grounds to test the shield in court, thus tying the C4 up considerably.
      However, the client should be advised that the chances of piercing through
      incontestability are about 2:1.

      Intellectual property law, with its focus on consumer protection, is probably a much
      more fertile area for client than the corporate control issues it is concurrently fighting.

3.    "Eagle Forum is perhaps the best-known conservative grassroots membership
      organization in America.  Eagle Forum is associated, 'one for one' with best-selling
      author, journalist, speaker and #1 activist Phyllis S. Schlafly.  Despite the existence of
      an independent board of directors for the two "wings" of Eagle Forum,[2] the right to
      decide membership in the organization, and therefore orthodoxy to conservative
      principles, has been held in a Trust, of which Schlafly is co-trustee with her son John,
      the organization's attorney.   The Eagle Forum board itself approved this
      arrangement."

---

[1] Hereinafter sometimes "P" or "PS".

[2] a 501(c)(4) not-for-profit organization called Eagle Forum and a 501(c)(3) not-for-profit organization called Eagle
Form Educational and Legal Defense Fund.

{00420788- 3 27647-001}

4.    NOTE: there is a wide range of cease-and-desist options and choosing the right one, with the right tone, is a matter of extreme prudence. I would prefer that the memo be read by all the relevant parties and that we get together and discuss: how to "reach out" to the C4 board about our trademark rights; what sort of demand or cease-and-desist letter to send; or whether we should proceed unilaterally. Further, I have attached a Missouri bar Journal article on cease-and-desist letters as some "food for thought" for when we sit down and discuss cease and desist in detail.

5.    Law sourced:

    a.    *Primary* focus is on trademark law.

    b.    Subsequent research revealed Right of Publicity to be equally fertile ground.

    c.    The Law of Unfair Competition. A term which may be applied generally to all dishonest or fraudulent rivalry in trade and commerce, but is particularly applied in the courts of equity (where it may be restrained by injunction) to the practice of endeavoring to substitute one's own goods or products in the markets for those of another, having an established reputation and extensive sale, by means of imitating or counterfeiting the name, title, size, shape, or distinctive peculiarities of the article, or the shape, color, label, wrapper, or general appearance of the package, or other such simulations, the imitation being carried far enough to mislead the general public or deceive an unwary purchaser, and yet not amounting to an absolute counterfeit or to the infringement of a trade-mark or trade-name.

    d.    The Illinois Deceptive Trade Practices Act.

    e.    Trade secret law.[3]

    f.    Copyright law is also touched upon briefly with respect to Phyllis Schlafly's writings inasmuch as they are still being published on the website and may still be claimed by the C4.

FACTS

6.    The recitation of facts in the May 2016 Eagle Trust Fund newsletter is incorporated in this memo by reference. The uniqueness and quality of the products produced and distributed by Mrs. Schlafly is well summed up by that newsletter. This uniqueness and quality will be important factors throughout this analysis.

7.    A trademark is traditionally defined as a word, phrase, symbol, and/or design that identifies and distinguishes goods of one party from those of others. In examining approximately 50 years of background materials, the Eagle was found in an astonishing *all four* perceptible forms: word, phrase, symbol, and design. Eagle was

---

[3] Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

found embodied as a "plain" word-mark, as part of the phraseology of various mottos and taglines, as symbols, and as designs both two-dimensional and three-dimensional.

8.     A compelling biography can be made going back to the 1950s demonstrating that Mrs. Schlafly's reputation precedes herself and that the organization she founded to distribute her services would be identified "one for one" with her and her reputation.

9.     October 20, 1975 incorporation in Illinois under the not-for-profit corporation act (hereinafter, "the C4").  Purpose of Corporation, "To provide educational services of all kinds for women and in support of moral, family, and patriotic principles."

10.    The present case involves just one particular form of Eagle: the word-mark EAGLE FORUM®.

11.    PS appears not to have assigned any of her rights or goodwill to the C4 when she incorporated, (nor at any later time.)  Nor did she execute an employment agreement.

12.    Before the C4 was incorporated, Mrs. Schlafly addressed her correspondents as, "Dear Eagle Subscriber".[4]

13.    In the 1970s Eagle Councils were held and included individual video training sessions.

14.    The whole symbol of Eagle represented her activist movement.

15.    In 2000-2001, Mrs. Schlafly undertook a process of formalizing various trademark rights she had been building through common-law use. She registered Eagle Forum in the name of the Illinois Not-For-Profit Corporation.   She used the same law firm for all of these trademark applications.

16.    "The President reported that a lawyer has been engaged to trademark protection of Eagle Forum's name and insignia".  (2001 annual meeting minutes signed by Mrs. Schlafly).

17.    On January 7, 2000, Mrs. Schlafly signed identical declarations "that she believes Applicant to be the owner of the trademark and service mark sought to be registered; that to the best of her knowledge and belief no other person, firm, corporation or association has the right to use that mark in commerce, either in the identical form or in such near resemblance thereto as may be likely, when used on or in connection with the goods and/or services of such other person, to cause confusion, or to cause mistake, or to deceive."

18.    Eagle Forum C4 "has successfully established trademark protection for Eagle Forum's name and eagle pin". (2005 annual meeting minutes signed by PS).

---

[4] November 1975 Eagle forum newsletter

19.    From 2016 online membership application form: "become a member of Eagle Forum and receive the *Phyllis Schlafly Report*."

20.    In this memo, the word "Eagle", as in "an Eagle" or "Eagles" (plural) will stand for all the different types of *consumers* of EAGLE FORUM services, be they followers, readers, political activists or convention attendees.

## SEMIOTIC ANALYSIS

21.    In order to maintain clear thinking, from start to finish, in the analysis of a given trademark problem, it is my practice to first analyze the subject trademark from a semiotic perspective.

22.    The triadic model of the *sign* holds that the sign consists of three subsign elements: a "signifier" (the perceptible form of the sign, e.g., the sound of the word "book" or "Buch" or "livre"), a "signified" (the meaning to which that perceptible form refers, e.g., the idea of a book), and a "referent" (e.g., a tangible book itself).[5]

23.    It is helpful then to look at trademark not as one thing but three things working together: a signifier (the perceptible form of the mark), a signified (the semantic content of the mark, such as the goodwill or affect to which the signifier refers), and a referent (the product or service with to which the mark refers).1

24.    In simple trademarks, the three parts of the trademark are clear.    E.g:



25.    In the case of Eagle Form, the triadic structure is not so clear-cut, and this perhaps is the source of our problem.

---

[5] Beebe, Barton "The Semiotic Account of Trademark Doctrine and Trademark Culture" See http://www.bartonbeebe.com/documents/Beebe%20-%20Semiotic%20Account.

| Signifier | Referent | Signified |
|---|---|---|
| Eagle (follower of Phyllis Schlafly) | Political and public advocacy services | Phyllis Schlafly |
| Eagle Trust | Publications | Phyllis Schlafly writings |
| Eagles Are Flying | Meeting and Convention Services | Phyllis Schlafly |
| Eagle Council | Meeting and Convention Services | Phyllis Schlafly |
| Eagle Forum | Publications, Educational Services, Association Services | Phyllis Schlafly (or is the C4 or C3 the signified? ~ Confusion exists!) |

26. Trademarks do not signify the origin of the goods to which they are affixed so much as they signify the origin of themselves, of the "ideas [and] communications" that they embody.

27. It is clear from the triadic model that what Eagle Forum is proposing to do is to submerge the referent in the signified. They want to give consumers a significantly different product. Eagle Forum (the company, the signified) wants to force-feed whatever Eagle Forum puts out. As one commentator noted, what happens in a case like this is:

> the "physical product," of whose source the consumer is ostensibly being informed by the trademark, is reduced to a nullity. The trademark's goodwill is commodified and sold as its own product. In effect, we are left with a purely linguistic, purely textual trademark, a dyadic relational system of meaning consisting only of a signifier and a signified. The law thus grants exclusive rights in the ends of consumption under the guise of granting exclusive rights in the means of consumption. In the past, conscientious judges have recognized this problem and sought to deal with it in a variety of ways.[6]

28. Trademark law is a species of consumer protection. Rights are awarded to trademark owners as part of the enforcement scheme, but the Judicial/legislative goal is to cut down on consumer search costs and actual confusion.

---

[6] Beebe, Ibid. p. 10

PUBLIC POLICY

29.    Trademark rights are accorded to "trademark owners" only by use.

30.    A trademark *user* will always be the favored party for obtaining trademark *rights*, unless the user has "slept on his rights" somehow, either by equitable doctrines or by not following the trademark schemata laid out by the Lanham act.[7]  but see infra for a suggestion.

31.    When a trademark dispute arises, it is usually to no avail to perfect the rights at that time. (Answer to Ed Martin question: "are there other "marks" or copyrights she should assert ownership of now in a more formal way?").  But see *infra* for one possible trademark application that might be filed profitably.

32.    Claimants who have followed the Lanham act, even though their claim may be inferior to the true user, may in some cases obtain a practical shield from trademark liability.  This is because the *optional* statutory scheme rewards those who DO opt-in, with certain procedural advantages.

33.    That is the situation we find ourselves in here.  The ownership of the C4 mark has obtained incontestability status as a result of having endured for five years (and by filing the necessary paperwork for incontestability).  See Incontestability discussion, *infra*.

34.    Our chief argument is that Eagle Forum's significance is to denote Phyllis Schlafly for goods and services issuing from Phyllis Schlafly.  And this runs to public policy.

35.    Knowing we have a strong argument from semiotics and basic trademark public policy that consumers would be confused by an unaltered use of EAGLE FORUM, the question then becomes, "What legal mechanism is best to employ to effect an outcome where a tribunal would take offensive action against the C4 to achieve an abatement of confusion?"

TRADEMARK REGISTRATIONS LOCATED

36.    The three (3) U.S. trademark registrations that were located are reproduced below at numbers 37, 38 and 39.

37.    Interestingly, both Eagle Trust Fund and Eagle Forum C4 filed the exact same application for the exact same goods in the exact same international class. (Publications, namely, newsletters, books, brochures, photographs, manuals, awards, pamphlets, bumper stickers, badges, banners, business cards" in International Class 16).

---

[7] 15 U.S.C. § 1051 et seq. (15 U.S.C. ch. 22).  Known as "The Lanham Act", The Lanham (Trademark) Act (Pub.L. 79–489, 60 Stat. 427, enacted July 5, 1946, codified at 15 U.S.C. § 1051 et seq. (15 U.S.C. ch. 22)) is the primary federal trademark statute of law in the United States.

38.    …

Int. Cls.: 16, 41 and 42

Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38, 50, 100, 101 and
107

**United States Patent and Trademark Office**    Reg. No. 2,475,317
                                                   Registered Aug. 7, 2001

## TRADEMARK
## SERVICE MARK
### PRINCIPAL REGISTER

## EAGLE FORUM

EAGLE FORUM (ILLINOIS NOT FOR PROFIT
  CORPORATION)
PO BOX 618
ALTON, IL 62002

    FOR: PUBLICATIONS, NAMELY, NEWSLET-
TERS, BOOKS, BROCHURES, MANUALS AND
PAMPHLETS FEATURING INFORMATION ON
CONSERVATIVE POLITICAL AND FAMILY VA-
LUES AND REPRESENTATIVE GOVERNMENT,
PRINTED AWARDS, UNMOUNTED PHOTO-
GRAPHS, BUMPER STICKERS, PAPER BADGES,
PAPER BANNERS AND BUSINESS CARDS, IN
CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

    FIRST USE 11-0-1975; IN COMMERCE 11-0-1975.

    FOR: EDUCATIONAL SERVICES, NAMELY,
CONDUCTING TRAINING WORKSHOPS, CLAS-
SES, SEMINARS AND CONFERENCES IN THE
FIELDS OF PROMOTING CONSERVATIVE VA-
LUES AND INCREASING CITIZEN KNOWLEDGE
OF AND PARTICIPATION IN REPRESENTATIVE
GOVERNMENT , IN CLASS 41 (U.S. CLS. 100, 101
AND 107).

    FIRST USE 7-0-1976; IN COMMERCE 7-0-1976.

    FOR: ASSOCIATION SERVICES, NAMELY, PRO-
MOTING THE INTERESTS OF CONSERVATIVE
AND PRO-FAMILY MEN AND WOMEN BY EN-
ABLING THEM TO PARTICIPATE IN THE PRO-
CESS OF SELF-GOVERNMENT AND PUBLIC
POLICY MAKING SO THAT AMERICA WILL CON-
TINUE TO BE A LAND OF INDIVIDUAL LIBERTY,
RESPECT FOR FAMILY INTEGRITY, PUBLIC AND
PRIVATE VIRTUE, AND PRIVATE ENTERPRISE,
IN CLASS 42 (U.S. CLS. 100 AND 101).

    FIRST USE 11-0-1975; IN COMMERCE 11-0-1975.

    NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "FORUM", APART FROM THE
MARK AS SHOWN.

    SER. NO. 75-892,545, FILED 1-7-2000.

    JODI LAUTERBACH, EXAMINING ATTORNEY

39.    ....

Int. Cl.: 16

Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38 and 50

**United States Patent and Trademark Office**

Reg. No. 2,497,754
Registered Oct. 16, 2001

### TRADEMARK
PRINCIPAL REGISTER



TRUSTEE OF THE EAGLE TRUST FUND, THE (ILLINOIS TRUST)
P.O. BOX 618
ALTON, IL 62002

FOR: PUBLICATIONS, NAMELY PAPER NEWS-LETTERS, PAPER BOOKS, PAPER BROCHURES, PAPER MANUALS AND PAPER PAMPHLETS IN THE FIELD OF OR CONCERNING THE SUBJECTS OF GOVERNMENT, FAMILY, AND EDUCATION ISSUES; PHOTOGRAPHS; BUMPER STICKERS; PRINTED PAPER AWARDS; PAPER BADGES AND

PAPER BANNERS, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 5-0-1967; IN COMMERCE 5-0-1967.

THE LINING SHOWN IN THE DRAWING OF THE MARK IS A FEATURE OF THE MARK AND IS NOT INTENDED TO INDICATE COLOR.

SER. NO. 75-892,655, FILED 1-7-2000.

JUDITH GRUNDY, EXAMINING ATTORNEY

40.    ....

Prior U.S. Cl.: 200

Reg. No. 2,671,224

**United States Patent and Trademark Office**    Registered Jan. 7, 2003

### COLLECTIVE MEMBERSHIP
### PRINCIPAL REGISTER



very early

EAGLE TRUST FUND, COMPRISING PHYLLIS SCHLAFLY AND JOHN F. SCHLAFLY, BOTH U.S. CITIZENS (ILLINOIS TRUST)
P.O. BOX 618
ALTON, IL 62002

FOR: INDICATING MEMBERSHIP IN A NATION-AL ASSOCIATION OF LIKE MINDED MEN AND WOMEN WHO SHARE CONSERVATIVE AND PRO-FAMILY VALUES , IN CLASS 200 (U.S. CL. 200).

FIRST USE 7-0-1967; IN COMMERCE 7-0-1967.

THE LINING IS A FEATURE OF THE MARK.

SER. NO. 76-226,565, FILED 3-16-2001.

JUDITH GRUNDY, EXAMINING ATTORNEY

41.    All three trademarks have been on the Principal Register for over five years and have applied for and been granted incontestability status (about which more later).

## HOUSE MARK v. PRODUCT MARK DISTINCTION
42.    Trademark attorneys who do branding often speak in terms of "House Mark" and "Product Mark".

43.    The signifier chart presented above clearly gives the impression of a house Mark versus product Mark arrangement.

44.    In the specimens provided to the trademark examiner for registration, the Eagle insignia is above and therefore by appearance is the House Mark and EAGLE FORUM is the Product Mark (see specimens, *infra*.).

45.    Conclusion: EAGLE FORUM is dependent on the House Mark EAGLE.

## DISCLAIMERS APPEARING ON REGISTRATION CERTIFICATES
46.    The United States Patent and Trademark Office may require a disclaimer as a condition of registration if a portion of a mark is merely descriptive or generic. And

it has done so in this case, by requiring the C4 to disclaim any rights to the word FORUM apart from the mark as shown.

47.    One purpose of a disclaimer is to enable the registration of a mark that is registrable as a whole, but contains matter that would not be registrable by itself. The USPTO issues disclaimer requirements to prevent a false impression that the owner of a mark has exclusive rights to a descriptive or generic term. A disclaimer does not physically remove the disclaimed portion from a mark or affect its appearance. Rather, the mark as a whole receives protection on the Principal Register, but the applicant usually cannot enforce rights in the non-distinctive portion by itself without some additional similarity to the mark as a whole. For example, the C4 could possibly enforce its registration against a confusingly similar mark such as "SEA-GULL FORUM", because the mark has terms similar to "EAGLE" in addition to the term "FORUM."

48.    Along the continuum of less distinctive marks, there is a fine line between merely descriptive and generic marks. It is uncertain whether FORUM would be considered merely descriptive or generic. The significance is that merely descriptive marks reference a specific characteristic of goods or services and can become distinctive as opposed to generic marks, which reference a particular category of goods or services. A party can never establish rights in a generic mark. On the other hand, registrants may attain rights in a descriptive mark if it acquires distinctiveness.

49.    As the C4 trademark stands right now, the C4 has no rights to use the word FORUM apart from the mark as a whole. Which means that, when comparing Phyllis Schlafly's House Mark EAGLE with EAGLE FORUM, the non-disclaimed portions are identical.

50.    This dents the C4's registration and gives us significant "bragging rights." However if the C4 attorney is clever, he could argue that even the word *FORUM* has acquired distinctiveness after 40 years of use.

MARK COMPARISON

51.    The C4 might object that the registered trademarks of Eagle Trust do not contain the word "Eagle" or "Forum". However, trademarks are compared for appearance, sound and meaning. The Eagle insignia is identical to the word EAGLE *in meaning*.

LICENSE THEORY

52.    "Given the common roots of the restaurants, ... a customer walking into [one] . . . would assume that they were related in some fashion" was the phrase the Trademark Trial and Appeal Board used in one case to discuss the existence of an implied license[8].

53.    Let us examine whether there are any valid licenses between the client and C4 under these facts.

---

[8] Woodstock's Enterprises v Woodstock's Enterprises, 43 U.S.P.Q.2d 1440, 1447 (TTAB 1997).

54.    An implied license can arise by virtue of the conduct of the parties, on the basis of which such an agreement can be reasonably inferred. Thus, whether an implied license exists depends on the overall conduct of the parties.

55.    In the most frequent situation of trademark, the licensee is trying to demonstrate the existence of a license to defend the rights against third parties. Here it is the putative licensor, Eagle Trust, that is trying to uphold the license. The test should be the same, however.

56.    The ultimate issue is whether the control exercised by the licensor is sufficient under the circumstances to satisfy the public's expectation of quality assurance arising from the presence of the trademark on the licensee's goods or services. Restatement (Third) of Unfair Competition § 33, comment c (1995).

57.    "The purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark or dress. Where the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, we will find a license valid".[9]

58.    There are three methods by which Mrs. Schlafly exercised the needed control.

    a.    Mrs. Schlafly made sure she was always serving on the boards and writing the bylaws in such a way to ensure she would always be circled on the board.

    b.    She specifically registered the one mechanism afforded by trademark law for controlling the membership of a membership organization

    c.    She created almost all of the international class 16 content: books, papers and most notably a monthly newsletter on politics and society *The Phyllis Schlafly Report*.

59.    At the time that all the trademark work was done, the trademark attorney filed specimens that were exactly the same: a sample newsletter. The trademark attorney merely circled which portion of the specimen related to which trademark that was being applied for, viz.:

---

[9] See Taco Cabana. International Inc. v. Two Pesos Inc., 19 USPQ2d 1253, 1259. (5th Cir. 1991), aff'd 505 U.S. 763, 23 USPQ2d 1081 (1993).

 

**EXHIBIT**
Class 16

PHYLLIS SCHLAFLY
PRESIDENT

December 1999

*Leading The Pro-Family Movement Since 1972*

EDUCATION CENTER: 7800 BONHOMME AVE., ST. LOUIS, MO 63105, (314) 721-1213, fax:(314) 721-3373
CAPITOL HILL OFFICE: 316 PENNSYLVANIA AVE., S.E., WASHINGTON, D.C. 20003, (202) 544-0353, fax: (202) 547-6996
OPERATIONS CENTER: P.O. BOX 618, ALTON, IL 62002, (618) 462-5415, fax: (618) 462-8909, eagle@eagleforum.org

Dear Eagle Friend,

Eagle Forum is going to help you and America survive one more year of Bill Clinton's Administration. How? By providing leadership on policies that affect our liberties, our culture and our national independence. Let me count the ways —

Our website — www.eagleforum.org — is our most exciting outreach — both to the younger generation and to adults who want to be accurately informed. We are not just "talking to ourselves." Every day we reach out to thousands of new friends! Our website enables us to bypass the biased media and spread the truth.

 

**EXHIBIT**
Class 16

PHYLLIS SCHLAFLY
PRESIDENT

December 1999

*Leading The Pro-Family Movement Since 1972*

EDUCATION CENTER: 7800 BONHOMME AVE., ST. LOUIS, MO 63105, (314) 721-1213, fax:(314) 721-3373
CAPITOL HILL OFFICE: 316 PENNSYLVANIA AVE., S.E., WASHINGTON, D.C. 20003, (202) 544-0353, fax: (202) 547-6996
OPERATIONS CENTER: P.O. BOX 618, ALTON, IL 62002, (618) 462-5415, fax: (618) 462-8909, eagle@eagleforum.org

Dear Eagle Friend,

Eagle Forum is going to help you and America survive one more year of Bill Clinton's Administration. How? By providing leadership on policies that affect our liberties, our culture and our national independence. Let me count the ways —

Our website — www.eagleforum.org — is our most exciting outreach — both to the younger generation and to adults who want to be accurately informed. We are not just "talking to

60.  This is strong circumstantial evidence that the intention of the parties was a deliberate *co-branding*. From this co-branding it could be inferred that a collaboration was intended and cross-licensing was implied, as each group was licensing a brand on the same product with the same "active ingredient", i.e., EAGLE. The word FORUM had been disclaimed for genericness in the very same application.

61.  These two specimens also bolster an argument Phyllis Schlafly could use "that the plan all along was for Phyllis to maintain control". This is because there is no way that a C4 newsletter could be put out without the official Eagle emblem, controlled by Eagle Trust, i.e. Phyllis.

62.    The fact pattern concerning Women's Forum cuts both ways. If the name had been Women's Forum, there would be no doubt about the ownership of the trademark by the C4 (and we would not be *here,* writing this trademark memo!)

63.    However, the C4 would have had difficulty securing trademark rights in Women's Forum, even if the feminist organization (which my research has revealed was actually an overseas organization and would not have impacted *US* trademark rights), had not had prior use of Women's Forum causing C4 to look for a different name. The term Women's Forum was obviously highly desirable because of its descriptive qualities. But it is those same descriptive qualities that would have made it difficult to register. In fact, on February 4, 2005, an applicant filed an application for registration of the trademark BUSINESS WOMEN'S FORUM and was denied registration on the principal register on account of the mark being "merely descriptive". Although it is possible that that trademark could *acquire* distinctiveness sufficient to accede to the Principal Register, that group has not done so as of today.[10] And they would have actually had more of a chance at getting trademark protection for their "Forum" because they had the additive "BUSINESS" in addition to WOMEN'S FORUM.

64.    Had the C4 tried to be WOMEN'S FORUM, the C4 would have been in a similar position as BUSINESS WOMEN'S FORUM found itself:

    a.    using a vulnerable, under-protected trademark,

    b.    being prey for both

        i.   competitors; and
        ii.  enemies bent on foul play (remember Larry Flynt's Jerry Falwell parody?).

65.    This is a situation that many business startups find themselves in, and that Eagle Forum found itself in 40 years ago. Because they are a new business, they want to get exposure to the public, and quickly. A trademark which describes what they do is a quick fix. But the downside is, their goodwill is bleeding out because of an insufficiently strong trademark. Plus they are at high risk for losing the trademark altogether, through genericness. The other horn of the dilemma is spending a huge amount of marketing dollars to further the recognition of a fanciful brand name, chosen by "the marketing committee".

66.    The solution was, for Phyllis Schlafly, since she was heading up the organization anyway, to lend the goodwill of the name she had built up for over 10 years: EAGLE. But she did not assign those rights. She did not even give up those rights. It was an expansion of her brand to a new entity. It was akin to "promotional licensing".

---

[10] See http://businesswomensforum.com/

67.     The evidence shows that the use of "Forum" presented a significant trademark problem to the C4 board, a problem that was solved by Mrs. Schlafly's generous donation, via trademark permission, of her well-wrought EAGLE trademark.

68.     It is clear from this course of conduct, and the behavior of the parties, that there was an implied license between Phyllis and the C4.

69.     "The controlled use of the trademark does not inure to the benefit of the licensee". Wilkof and Burkitt p. 92.

70.     It is well established in Illinois that when one uses a trademark under license from another, this use of the designation as a mark inures to the benefit of the licensor. [11] therefore the C4 was actually building up rights for PS all along, and built no rights for themselves, under the licensing theory. Eagle Trust for Phyllis Schlafly herself could have easily registered the Eagle Forum name in their own names, even if the main use was being made by the C4.  I do not know if the attorneys offered that option.

71.     The Fifth Circuit . . . held that a person like [licensor] does acquire trade or service mark ownership through first use by controlled licensees even though [licensor] itself may not have "used" the mark.  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:46 (4th ed. 2005).

72.     Under the license theory, Phyllis Schlafly or the Eagle Trust owns the trademark in the house mark EAGLE and is the "beneficial owner" of EAGLE FORUM.  It does not matter that Ms. Schlafly is a different entity than the C4.[12]  The C4 would be called the "proprietor" of the mark EAGLE FORUM.

---

11 See, e.g. Ty, Inc. v. Publ'ns Int'l, Ltd., 2005 U.S. Dist. LEXIS 23420, at *5 (N.D. Ill. Feb. 25, 2005) (quoting 4 McCarthy on Trademarks and Unfair Competition § 18:46 (2004)).

12 1. 15 U.S.C. § 1055. The test of a "related company" is the same as that used to determine whether adequate quality control is exercised over a trademark licensee" McCarthy 18:51. In order to demonstrate related companies doctrine, there must be a showing of a substantial relationship between the parties. Secular Organizations for Sobriety, 213 F.3d at 1131. The statute does not require formal corporate control but only control over the "use of a mark." Estate of Coll–Monge v. Inner Peace Movement, 524 F.3d 1341, 1348 (D.C.Cir.2008) (citing Turner v. HMH Pub. Co., 380 F.2d 224, 229 (5th Cir.1967) (plaintiff as licensor "introduced ample evidence to show that [it] fully controlled and dictated the nature and quality of the goods and services used in connection with the trade and service marks by the several [independently owned] licensees"); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:51 (4th ed.2005) (term "related" "is not limited to control of a company in general" but "simply refers to control over the 'nature and quality of the goods and services used in connection with which the mark is used.' ")). *11 Defendants incorrectly argue that there needs to be formal type of relationship such as parent-subsidiary relationship or a partnership or a familial relationship in order to be a "related company" under 15 U.S.C. § 1055. As noted above, the focus is not on corporate formality but on the quality control over the nature of the quality of the service.

73. If there is a license it should be terminated immediately. "An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor." Arthur L. Corbin, Corbin on Contracts § 96, at 413. *There would be potential upside, and no potential downside, to sending a letter to the C4 asserting that their license is terminated*

74. Failure to stop using the trademark after license revocation would constitute infringement. "The final question, then, is the point at which the implied license was actually terminated. While a license is valid, a licensee's use of the licensor's trademark is not, without more, infringement; it is only when the licensee no longer has consent that the continued use constitutes infringement.[13]

### TRADEMARK ANALYSIS

75. **The issues in this case may well be a case of first impression.** This is likely because in ordinary business most established House Marks will not create a new corporate entity and give it control of a Product Mark which could dilute the brand, simply on the promise of board membership in the new corporate entity of one of the principals of the entity that controls the House Mark.

76. The Declaration that Mrs. Schlafly signed on January 7, 2001 (see facts above) could aid in inferring an exclusive license to the mark EAGLE FORUM, but it might also imply an assignment of trademark rights to the C4. If it came to trial, each side would be putting the best spin on why it was true that "no other person" (words of the Declaration itself ) had the right to use the mark in commerce.

77. The holding of video training sessions is a classic educational function that would be closer to the category trademarked by the C3, rather than the C4.

78. The fact that Phyllis is just co-trustee of the Eagle Trust does not derogate her ability to be licensor to both entities:

> "An individual like any legal person can be the license or of trademark. In particular, a shareholder or officer of the company may claim proprietorship in the trade mark by virtue of use by related company,...."[14]

79. Sometime in the 60s, at least by 1967, Mrs. Schlafly established by common law use, in all 50 states, *EAGLE* as both a word mark and a design mark (via an insignia) for membership services, educational services and printed matter.

80. In consenting to the registration by C4 of the mark EAGLE FORUM, it was done via licensing and not with an assignment.

---

[13] All Star Championship Racing, Inc. v. O'Reilly Automotive Stores, Inc. United States District Court, C.D. Illinois.April 18, 2013940 F.Supp.2d 850

[14] Ibid p. 96

81. Mrs. Schlafly did not license her trademark to an organization that was simply an empty vessel into which could be filled any sort of political opinion, or social opinion. that pleased the majority of the board. Mrs. Schlafly's licensing of the trademark (and her copyrighted materials) were predicated on her control of the organization, through the implied consideration of an understanding that she serve as president for as long as she so chose and that she and other board members be term-limited.

82. "Likelihood of confusion" is the test that undergirds trademark infringement liability, unfair competition liability, and liability under the Illinois Uniform Deceptive Trade Practices Act. In this case, the typical likelihood of confusion scenario is an Eagle who trades for EAGLE FORUM but instead receives a product or service that either was not written by Phyllis Schlafly, or does not have Phyllis Schlafly's approval or does not contain either the quality or consistency of Phyllis Schlafly, and thereby an essentially fraudulent sale takes place. Likelihood of confusion is heavily based on the sophistication of the purchaser. The C4 will argue that once the word gets out that Phyllis Schlafly is no longer associated with at least the C4 Eagle Forum, the likelihood of confusion of such a smart and savvy group will be minimal. However there are different types of confusion that bring more of the general public into the purview. These auxiliary methods of finding likelihood of confusion would be more prominent in the situation where the goal of the organization is to influence the public at large in political matters.

83. These types of confusion are:

   a. Initial Interest Confusion: since customers start with people who are initially interested, confusion at that level may thwart a potential new Eagle.

   b. Point-Of-Sale Confusion: a classic example of a point-of-sale is the cosmetics counter at a department store. Women know to go to that counter to purchase their favorite perfume and they count on not being confused by the signage. Since many of Eagle Forum services arrive by mail, and both the C4 and C3, for example, will be sending their products through the mail, the mail becomes a sort of point-of-sale (like the perfume at the cosmetics counter in the department store).

   c. Post-Sale Confusion: since many of the Eagle Forum publications are passed around, is kept in libraries etc. the possibility distinctly exists that parties beyond the initial purchaser at the point-of-sale will be confused by the difference in consistency, quality, and source.

INFRINGEMENT ANALYSIS

84. Mrs. Schlafly's rights must be looked at in terms of a sword and shield. The shield would prevent the C4 from shutting down Mrs. Schlafly's uses of Eagle Forum. One powerful shield is the doctrine of acquiescence.

85.     Regardless of whether Eagle Trust's trademarks are infringed by EAGLE FORUM or not, there is a clear likelihood of confusion between the dual uses of EAGLE FORUM, by the C3 and C4. Will cause brand confusion and dilution. *This must be resolved in my opinion.*

UNFAIR COMPETITION

86.     It seems to us that unfair competition is an area in which Phyllis wins all day long. But the downside to the win is that it will probably be cured with a disclaimer, rather than outright forfeiting or transferring of the trademark.

87.     Unfair competition is defined in two ways. It is sometimes used in the broadest sense as covering any cause of action dealing with "commercial immorality".  "Unfair competition law" is most commonly used in referring to an action for "passing off," that is, an action against an individual that passes off its goods as those of another. "Unfair competition" is a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  It is also a common law violation in Illinois.

88.     P could allege malicious intent to deliberately and willfully trade on P's long-standing and hard-earned goodwill in its name and marks and the reputation established by P in connection with her products and services.  P could allege that EF's conduct is likely to cause confusion, mistake or deception as to the affiliation, connection or association of the C4.

89.     P could allege false designation of origin and/or a false representation in that C4's use of which falsely designates, describes or represents the C4's services and business as originating from or being in connection with PS.

90.     Allege that the C4 is likely to cause confusion, mistake or deception as to the affiliation, connection or association of C4 with P, especially consumers using P's EAGLE name and mark who are wrongfully redirected to C4's website.

RIGHT OF PUBLICITY and OVERCOMING INCONTESTABILITY

91.     All three of the trademark registrations have attained "incontestability" status under 15 U.S.C. Sec. 1065.  But there are two complementary sections here section 1064 and section 1065 which adjudicate what the term incontestability means in practicality. Care is needed, because as one commentator noted, "the shield of incontestability has been likened to the proverbial armor made of Swiss cheese rather than a coat made of metal."

92.     Under §73 of the Trademark Act, 15 U.S.C. §1141m, "if a holder files an affidavit that meets the requirements of §15 of the Trademark Act, a... registered extension of protection to the United States may become "incontestable".[15]

---

[15] (b) Incontestability; defenses To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. Such conclusive evidence shall relate to the exclusive right to use the

93.    It is at this point that I think it is useful to quote one commentator at length in the point of incontestability.

> If a prior user sold goods bearing the mark in an area prior to use in that area by the owner of an incontestable registration and prior to the registration date, the prior user would have superior rights and could in fact block the registrant's use of the mark in that area. A prior user could even be the prior user nationwide, and thereby be entitled to block a registrant's use of the mark throughout the entire country as happened in Cuban Cigar N.V. v. Upmann International, Inc.

> Recent cases have echoed this theme, further confirming that the owner of an "incontestable" registration is still subject to challenge by a prior user. The law thus allows the rather odd situation where the owner of a registration – even an incontestable registration – that is more than five years old and that therefore cannot be cancelled by a prior user under Section 14 of the Trademark Act can still be subject to an injunction by a prior user prohibiting use of the mark within the prior user's territory, which can extend nationwide. This is often overlooked in trademark analysis, as it is counterintuitive to the oft-expressed concept of incontestability as "quieting title" to the registration forevermore.

---

mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 1065 of this title, or in the renewal application filed under the provisions of section 1059 of this title if the goods or services specified in the renewal are fewer in number, subject to any conditions or limitations in the registration or in such affidavit or renewal application. Such conclusive evidence of the right to use the registered mark shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects: (1) That the registration or the incontestable right to use the mark was obtained fraudulently; or (2) That the mark has been abandoned by the registrant; or (3) That the registered mark is being used by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; or (5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057 (c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved; or (6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or (7) That the mark has been or is being used to violate the antitrust laws of the United States; or (8) That the mark is functional; or (9) That equitable principles, including laches, estoppel, and acquiescence, are applicable.

Indeed, incontestability does not quiet title in the sense of quashing all claims of prior rights, but rather only quashes certain grounds for challenging the registration and strengthens the evidentiary status of the registrant's right to use the mark as against persons who are not prior users.[16]

94.    Incontestability status has less effect than is commonly thought (by virtue of its name) and is probably over used. Attacks on ownership in cancellation actions, are still possible after 5 years. But I do not yet see in our facts the additional elements of fraud etc. that we would need (see footnote) in the affidavits of ownership that were previously made. I am not sure that this fraud angle could not still be used in this case. I take it that in many cases where you have an importer registering a mark that is really owned by a foreign manufacturer for example this kind of attack by the manufacturer regularly works. I think this may be kind of an analogous case. However, I was not able to locate in our shortened timeframe, such a case. It may be that importers always assign such rights eventually to the manufacturer, being dependent upon the manufacturer for everything. Indeed, this case is sort of a test to see if Eagle Forum as the "importer" of Phyllis Schlafly-manufactured product is dependent upon her enough to assign their improvidently-gained trademark rights "or else".

95.    The following Sixth Circuit case presents the classic "shield" that a prior user such as Eagle Trust would have against an incontestable trademark such as EAGLE FORUM's "sword": "Plaintiff's 1988 federal registration of the mark has become incontestable; the Lanham Act protects Plaintiff's incontestable right to use the mark throughout the United States unless the Defendant had acquired valid rights to the name under Kentucky law"[17]

96.    This line of cases could potentially give to the C3 a shield prior to the publication of the EAGLE FORUM trademark in roughly 2000 (i.e. from at least 1981-2000, but maybe thereafter as well).   But the C3 situation is complicated because it is so thoroughly blended and intermixed with the C4.

97.    Elements of a false endorsement claim under the Lanham Act are that (1) the defendants have a protectable trademark, and (2) a likelihood of confusion will exist as to the origin of the plaintiff's products. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

98.    But the registrant may enjoy the effects of incontestability under § 15 only as to those goods or services which are recited in the incontestable registration, and not as to any

---

[16] Keith A. Barritt, "Prior User vs. Federal Registrant: Whose Mark Is It, Anyway?"

February 18, 2009 http://www.fr.com/news/prior-user-vs-federal-registrant-whose-mark-is-it-anyway1/ (accessed June 3, 2016. (citations omitted)

[17] 188 F3d 408 Advance Stores Company Incorporated v. Refinishing Specialties, Inc. 188 F.3d 408, f.n. 11 (6th Cir. 1999)

other goods or services which may be confusingly similar thereto, but as to which the registrant has only common-law rights or a registration which is not yet incontestable.[18]  *Thus, client should parse the list of goods and services in the registration above to determine if the C4 is doing anything or selling anything that is not covered by the list of goods and services.* Those do not receive the shield of incontestability, and give us added leverage.

99.    The irony is, that the C4, through the use of the mark EAGLE FORUM, has been building up strong trademark rights for the overall EAGLE brand, and for Phyllis Schlafly, for these last 40+ years.  But the one thing that Phyllis Schlafly cannot do it seems is cancel the shield of incontestability awarded by the US Patent and Trademark Office. Thus the relationship is akin to an exclusive perpetual license.

100.   The "end around" is to use the weak grounds for overcoming incontestability, the somewhat stronger grounds of infringement of EAGLE by EAGLE FORUM, false designation of origin, and unfair competition, wrap them up in one big lawsuit like Jimmy Buffett did (who eventually prevailed through settlement).

101.   This would involve Right of Publicity law as well as Lanham act and state trademark law.

102.   Jimmy Buffett is a country and rock singer who wrote and recorded a song in the 1970s called "Margaritaville."  The song slowly gained traction over a 30-year period to the point where it was a household word and associated one-for-one with the person of Buffett.

103.   There are also cases involving fashion model Twiggy and the University of Notre Dame. All of these cases deal with Lanham Act 1052 (a) which protects persons, living or dead, and institutions from trademarks that may falsely suggest a connection, disparage or bring them into false light.

104.   The purpose of § 1052(a) is "to protect 'the name of an individual or institution which was not a technical trademark or trade name upon which an objection could be made under Section 2(d).'" [19]

105.   The Federal Circuit further stated that to succeed on such a ground [false connection] the plaintiff must demonstrate that the name or equivalent thereof claimed to be appropriated by another must be unmistakably associated with a particular personality or "persona" and must point uniquely to the plaintiff. [20]

---

[18] 4A Callmann on Unfair Comp., Tr. & Mono. § 26:106 (4th Ed.)

19 Lesley Hornby v. TJX Cos., Inc., 87 U.S.P.Q.2d (BNA) 1411, 1424 (T.T.A.B.2008) (quoting Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 703 F.3d 1372 (Fed.Cir.1983))

20 Lesley Hornby v. TJX Cos., Inc., 87 U.S.P.Q.2d (BNA) 1411, ____ (T.T.A.B.2008) (quoting Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 703 F.3d 1372 (Fed.Cir.1983))

106.    All three of these cases deal with the famous four factor test[21], sometimes called the Buffett test.

107.    This Buffett test has been followed by the Board in subsequent decisions. See In re North American Free Trade Association, 43 USPQ2d 1282 (TTAB 1997); In re Nuclear Research Corp., 16 USPQ2d 1316 (TTAB 1990). However, in some of the decisions involving the false suggestion of a connection ground the language of the second factor has been modified somewhat, to state "that the marks would be recognized as [the same as, or a close approximation of, the name or identity previously used by the other person], in that they point uniquely and unmistakably to that person." See L. & J.G. Stickley Inc. v. Cosser, supra at 1972; In re White, supra; In re Urbano, 51 USPQ2d 1776 (TTAB 1999); In re Wielinski, 49 USPQ2d 1754 (TTAB 1998). This modified language recognizes the requirement set forth by the Federal Circuit that the name claimed to be appropriated by the defendant must point uniquely to the plaintiff.

COLLECTIVE MEMBERSHIP MARK.

108.    Collective Membership Mark ("CMM"): A mark adopted or intended to be adopted for the purpose of indicating membership in an organized group. For example, the letters AAA inside an oval indicates membership with the American Automobile Association.

109.    Neither the C4 or the C-3 has a trademark registration for a Collective Membership Trademark where "The applicant controls the members' use of the mark as specified in the applicant's bylaws or other written provisions".  This would've been used to control the affiliation of Eagle Forum chapters or members.  However, the trust does!

110.    Method of Control: The applicant must specify how it controls or, if filing under Section 1(b), intends to control the use of the mark by members. If the applicant's bylaws or other written provisions specify the manner of control, or intended manner of control, applicant may simply state that.

111.    The official "drawing" of the Certification member mark is this:

---

[21] (1) Is the mark the same as, or a close approximation of, the name or identity previously used by another person or institution? (2) Would the mark be recognized as such, in that it points uniquely and unmistakably to that person or institution? (3) Is the person or institution whose name is reproduced by the mark connected with the activities performed by the trademark applicant under the mark? (4) Is the fame or reputation of the person or institution such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed?



112.    The CMM was proven with this specimen



113.    Argue that the preservation of the right to certify who was an Eagle and who was not, through the Collective Membership Mark, was the ultimate trump card that Phyllis kept for herself in case the organization would ever run astray from its values. And that time is now! And everybody on the board knew about it. And that is why it was registered the way it was. The Eagle Forum board would own the trademark for convenience, limited liability protection, inheritability etc. but that right was completely subject to the control of Phyllis Schlafly as Grande Dame of conservative women in the pro-family cause, as Master Licensor.

114.    How much of a "make-weight" argument though that would be, we can discuss. We can talk about the level of control and whether it has been just too minimal.

115.    Putting the best light on it: For a web user to have arrived at the page where she is ordering an Eagle pin, anyone would have had to have spent some time on the website familiarizing herself with the positions of Phyllis Schlafly. If an order came in from the National Organization of Women for 100 pins, the order would surely be denied.

It seems that the Eagle pins have been pretty well controlled, given how difficult such control is in the age of Internet-distribution rather than hand-to-hand distribution or distribution through the receipt of handwritten requests.

116.  Argue that since the right to certification was retained by Phyllis, that that was the essential quality control mechanism. She could make the board members turn in their pins (hard ball, to be sure). She could get more consistent in certifying members (i.e. followers or Eagles) and have a real program for determining who gets the pins and who does not.

117.  Especially in light of the current unpleasantness, we should discuss the possibility of stepping up the use of the pins, making people sign pledges to support the nominee of the Republican Party whomever he may be, etc.  From the perspective of trademark law, and harvesting good fruit from the Collective Membership Mark that was registered 25 years ago, it would be worth doing.

TRADE SECRET LAW[22]

118.  Need to decide how to deal with IP rights in **member list/data**. (Protectable under the Illinois act).  It is tougher to argue intellectual property ownership of membership lists and business/web data because these are maintained by the C4.  We can certainly argue that when people turned that data over originally they thought they were turning it over to Phyllis.  But I think the C4 has the better part of the argument for the reasons. C3 and C4 might want to send joint letter to explain the split, and what happens to the data, in any event.

ILLINOIS DECEPTIVE TRADE PRACTICES ACT.

119.  The Illinois Uniform Deceptive Trade Practices Act 815 Ill.Comp.Stat. § 510/2 states that "A person engages in a deceptive trade practice when,…the person (1) passes off goods or services as those of another; (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causes a likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;" Further, in order to prevail "a plaintiff need not prove competition between the parties or actual confusion or misunderstanding."[23]This law is very favorable to us under these facts.

120.  The Law of Unfair Competition and the Illinois Deceptive Trade Practices Act.   PS should allege loss of business, profits, goodwill, and reputation in amounts that are yet unascertained due to the unfair use of EAGLE.

COEXISTENCE AGREEMENTS.

121.  In order to avoid litigation, consider a Coexistence Agreement:

---

[22] Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

[23] 815 Ill.Comp.Stat. §510/2.

a.   Allows potentially conflicting marks to peacefully coexist in the marketplace without threat of litigation or other dispute

b.   Permits coexistence of marks, including both use and registration of marks, and provides terms to govern continuing coexistence.  The parties recognize their rights in their respective marks and agree on terms on which they may exist together in the marketplace

c.   The agreement attempts to set forth the respective rights of the parties in sufficient detail to avoid future disputes

d.   Anticipates future expansion of use by the parties.

122.   This kind of agreement would be the opposite of the license which we currently have in place (implied). It would extinguish the license, in fact.  "A license integrates, while a consent differentiates." McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed.) (2009).

123.   Things that will have to be settled in any coexistence agreement.

a.   New Variations of Mark.

b.   Adding Logo or new words (E.g. case where Caesars Palace becomes Caesars Atlantic City).

c.    Who has right to enforce mark against third parties down the road.

d.   Many years down the road, what if one party abandon? Wants to assign? Wants to sublicense?

124.   The Big Question: Is it better to have agreement that is based on the parties never interacting or one that will require interaction on regular basis?

a.   Conservative view:

i.   No future interaction

ii.   Unrealistic to expect otherwise

b.   Brand management view: Need to have interaction since coexistence connects the brands even if likelihood of confusion can be abated.

125.   Tricks that can be used in a coexistence agreement:

a.   Mark can be used only in close proximity to parties' House Mark and in never in font that is larger than House

    b.      Use only in combination with Distinctive Logo (eagle?). Whether this is practical or realistic will depend on the compromise that is chosen.

    c.      Use only when accompanied by disclaimer. (Question about whether disclaimers work).

126.   How to police/respond to consumer inquiries if not clear whose products/services are in issue.

127.   Some registrations are going to have to be cancelled/some re-registered, and new ones registered.

REGISTRATION BY THE C3

128.   Although it should be coordinated with the overall strategy, I do not think the C3 has anything to lose by filing an application for registration for EAGLE FORUM for publications and educational services (not association services) . It is likely that the examining attorney might issue an office action. We can try to obviate an office action by filing a related company statement under section 1055.[24] if denied registration, we can file a cancellation which would bring the issue of the implied license from Eagle Trust to the fore. I would envision Eagle Trust and C3 being co-petitioners in this cancellation.

FEDERAL COURT ACTION

129.   The US District Court would have direct jurisdiction of this matter and all the state law claims mentioned above would be preempted. There is copyright preemption also.

COPYRIGHT

130.   The only copyrights that were filed appear to be filed in the name of either Phyllis Schlafly or Eagle Forum Education & Legal Defense Fund. Mrs. Schlafly having signed no employment agreements or an independent contractor agreement, and not in any way being a statutory employee, I find that none of her writings are covered by the Work Made for Hire doctrine and therefore belong entirely to herself as author and owner.

---

[24] §1055 USE BY RELATED COMPANIES AFFECTING VALIDITY AND REGISTRATION: Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

STRATEGY/STATEMENT TO C4.

131.  The risk in trademark law is not with action, but with inaction.   This fact can be presented to the C4: Phyllis Schlafly had to act, or risk losing her other EAGLE brands.

> "So long as the public obtains what it expects, there is no harm to the trademark, whether or not quality controls are exercised by the licensor. Only if the licensee changes the quality of the goods, for better or for worse, are expectations upset and only then could the trademark be denigrated or diminished. In such case, the licensor has an obligation to act and to reassert quality control standards over the marketing and distribution of the goods, if possible." [25]

Thus, if the EAGLE FORUM customer base has its expectations upset, and it is led to believe, for example, that Donald J. Trump is the first non-acceptable Republican Party candidate for president in 40 years, when in fact he is acceptable, then EAGLE FORUM, and the EAGLE (house mark) brand would be denigrated and diminished … and, eventually, destroyed.

132.  As mentioned above, I think a real-time conversation among all those receiving this memo about cease-and-desist strategy, is advisable. But I think there is enough here, despite the doubts concerning whether we have enough of a sword to defeat the incontestable registration, to tell them that any further use of their mark at this point in time represents unfair competition, right of publicity infringement, and trademark infringement and possibly all three.   Further, that we are pulling all Phyllis Schlafly content from C4 organs, they are not to use anything of hers on the website, and to continue using the Eagle Forum name, implying as it does in association with Phyllis Schlafly after the receipt of our letter represents willful infringement and exacerbated damages.

END

---

[25] Alfred M. Marks, Trademark Licensing—Towards a More Flexible Standard, 78 TRADEMARK REP. 641, note 5, at 650–53. (1988)

# AVOID BECOMING A TRADEMARK BULLY:
## THE ART OF WRITING CEASE AND DESIST LETTERS

**DREY COOLEY[1]**



"GOVERN YOURSELF ACCORDINGLY." IF YOU HAVE EVER USED THIS PHRASE, STOP. IT IS AMONG THE LEAST PRODUCTIVE (OFTEN, COUNTERPRODUCTIVE) AND UNNECESSARILY PASSIVE-AGGRESSIVE PHRASES IN AN ATTORNEY'S LITERARY ARSENAL. TO CONVINCE YOU, I COULD TAKE THIS OPPORTUNITY TO QUESTION WHAT YOU THINK THE PHRASE TRULY MEANS OR WHAT GIVES YOU THE RIGHT TO TELL AN OPPOSING PARTY HOW TO GOVERN ITSELF, BUT I WILL REFRAIN. INSTEAD, I WILL OFFER A DOSE OF REALITY.

Admittedly, the phrase sounds fun to use, and, after all, where else in life can you get away with making such an authoritative statement, other than in a cease and desist letter? However, unless you are paid to avoid resolution, incentivize noncompliance, and ignite a publicity nightmare for your client, you should cease and desist using it. Indeed, with the explosion of social media and the introduction of the concept of social shaming, attorneys should take great care to analyze whether it is even in their client's best interest to send a cease and desist letter for trademark infringement claims. If it is, that same attorney must ensure that the substance of the letter is tailored to the unique facts of the case and that the form, style and tone of the letter are customized for the intended recipient in order to avoid becoming known as a "trademark bully" and to maximize the chance of efficiently and cost-effectively eliminating the suspected infringement.

## The Elements of Federal and Missouri Trademark Infringement

Trademarks are primarily regulated by the federal Lanham Act.[2] The Lanham Act protects trademarks used in interstate commerce through, among other things, the recognition of federal causes of action for trademark infringement, trademark dilution and unfair competition. In order to state a claim under the Lanham Act for trademark infringement, a plaintiff must plead and prove "(1) ownership of a distinctive mark or name, and (2) defendant's use of a similar mark or name is likely to cause confusion as to the source of the products [or services] sold [or offered] by defendant."[3] Proof of intent is not required.[4]

Trademark litigation often centers upon the existence of confusion amongst consumers, leading many courts to opine that likelihood of confusion is the "hallmark of any trademark infringement claim."[5] To determine "whether a likelihood of confusion exists, court[s]" consider the following factors:

1) the strength of the owner's mark; 2) the similarity between the owner's mark and the alleged infringer's mark; 3) the degree to which the products [or services]

compete with each other; 4) the alleged infringer's intent to pass off its goods [or services] as those of the trademark owner …; 5) incidents of actual confusion; and 6) whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist.[6]

Missouri also recognizes a cause of action for common law trademark infringement.[7] The elements, however, are essentially identical to the requirements under the Lanham Act.[8]

## The Purpose of Cease and Desist Letters for Trademark Infringement Claims

According to the American Intellectual Property Law Association's *2015 Report of the Economic Survey*, the median cost of litigating a trademark infringement claim, when less than $1 million is at risk, is $325,000.[9] While that exact number is highly debatable, like any other complex federal matter, trademark litigation is expensive. And the funds necessary to litigate a trademark claim only increase as the stakes get higher.

Consequently, there are very few circumstances in which an attempt at pre-litigation resolution of a trademark infringement claim is not in the best interests of the client. More importantly, for most clients with limited resources, pre-litigation resolution represents the *only* opportunity to eliminate suspected infringement. For those clients, protracted litigation is simply not an option.

Trademark cease and desist letters come in all shapes and sizes. Essentially, any letter informing an opposing party of a potential trademark infringement claim and demanding that the infringement be stopped qualifies as a cease and desist letter. However, in many cases, cease and desist letters serve other purposes. For example, rather than eliminating the infringement, a client may desire to (1) receive a settlement payment; (2) enter into a license or coexistence agreement; or (3) leverage a sale of its intellectual property rights in the trademark to the infringer.

Other purposes are less obvious. While the Lanham Act does not require a demand to be made upon an opposing party prior to initiating trademark infringement litigation, making an early demand might be rewarded by a factfinder, especially where obvious infringement exists. Additionally, in some federal circuits, notice of a claim can provide the requisite personal jurisdiction necessary to file your lawsuit in the jurisdiction of your choice.[10]

Thus, sending a cease and desist letter can serve a number of goals. However, as discussed below, many of those goals are merely theoretical if time is not spent analyzing the facts of each case and customizing a well-reasoned letter. In short, rapid fire, boilerplate cease and desist letters are simply not worth the paper on which they are written.

## The Danger of Not Knowing Your Audience and the Risk of "Social Shaming"

You are the CEO of a large, nationwide corporation. Your company's intellectual property is its most valuable asset. You are cognizant of your company's obligation to police against trademark infringement.[11] You are equally aware that your company, with its financial might, would be an intimidating foe to smaller organizations – even those that may or may not be truly infringing upon your trademark. You learn that a small company is

using your mark, and you want them to stop. Even though you know that the small company's use of the mark likely does not create a likelihood of confusion amongst consumers, you instruct your attorney to send a cease and desist letter anyway. After all, the worst that can happen is that the company refuses to stop using the mark, right?

Wrong. Take, for example, Hansen Beverage Company, the makers of Monsters energy drinks (MONSTER ENERGY®). In 2009, Hansen sent a cease and desist letter to a small Vermont brewery, Rock Art, demanding that it stop using "The Vermonster" as a trademark for its beer.[12] Rock Art did not just refuse. It fought back. Largely though a grassroots Internet campaign, Rock Art garnered support for its position, leading to, among other things, the creation of the widely tweeted Twitter hashtag #MonsterBoycott.[13]

As one might imagine, this was not the result Hansen intended. The negative publicity caused Hansen to back down and enter into an agreement with Rock Art permitting Rock Art's continued use of The Vermonster.[14] Instead of eliminating use of The Vermonster, Hansen drew attention to it and, in the process, damaged its brand.

Hansen is not alone. In 2011, Chick-fil-A sent Bo Muller-Moore, sole proprietor of a "small, eco-friendly t-shirt business" in Vermont, a cease and desist letter demanding that he stop selling t-shirts with the phrase "Eat More Kale."[15] The restaurant chain argued that the phrase infringed upon its own trademark, "Eat Mor Chikin," and cited in the same letter examples of its previous success in shutting down other "Eat More" slogans.[16]

Moore did not succumb to the pressure. Instead, backed by tens of thousands of online fans, he continued with his plans to register his trademark.[17] A Change.org petition entitled "Chick-fil-A: Stop Bullying Small Business Owners" and likening Chick-fil-A to a "Corporate Goliath" and a bully was signed by more than 40,000 supporters,[18] forcing Chick-fil-A to issue a press release attempting to justify its own actions.[19] Moore eventually succeeded in registering his trademark.[20]

These are but two of many examples of a growing trend known as "social shaming." Facebook, Twitter, YouTube and blogs are as much marketing resources for your clients as they are publicity landmines. With the click of a button, one person can create an eternal headache for your client's marketing department. Gone are the days when a large company can, without risk, get what it wants from smaller organizations merely by flexing its corporate muscles. In today's world, infringement claims should be thoroughly vetted before those muscles are flexed.

If the risk of social shaming does not alter *when* and *how* you send cease and desist letters for your clients, it should. Your clients are very likely already aware of the risk, especially those with a substantial online presence. In the heat of the moment, however, a client might not think of those ramifications. It is your duty as an attorney to remind the client of those ramifications so that it is cognizant of the risks of proceeding, especially where the infringement claim is tenuous at best.

## Considerations for Writing Cease and Desist Letters

Consider the following scenario: You represent a mid-sized business. While the client has brick-and-mortar retail locations in Kansas City and St. Louis, it also has an online retail store, which generates most of its revenue. The client has a registered



trademark and seeks your assistance in curtailing purported infringement of that mark by an opposing party.

What is the first thing you should do? Fire off a threatening, boilerplate cease and desist letter demanding that the infringer stop using the trademark? That, very likely, is what your client will request. However, if you have read this far, you know that is not wise. If your client wants the letter to have any traction at all, numerous questions should be answered and issues analyzed before the letter is sent, including:

- What are your client's goals? To stop the infringement? To obtain a settlement payment? To extract a license or co-existence agreement from the infringer?
- What is the size of the infringer? Is it a Fortune 500 company that is used to receiving aggressive cease and desist letters, or is it a small, family-run retail business in Alaska?
- Does the infringer have an online presence? Does it have a Facebook page, a Twitter feed, or a YouTube channel? Does it have a sizeable social media fan base, through which a grassroots "social shaming" campaign could be launched?
- Was the infringement intentional? Is there demonstrable evidence that the infringer had actual knowledge of your client prior to the infringement, or is the infringement purely coincidental? Coincidental infringement is still actionable. However, whether or not the infringement is believed to be intentional could affect the tone of the letter.
- How strong is your client's trademark? If the trademark is registered, yet considered weak, the client should be aware that sending a cease and desist letter may cause the recipient to initiate a cancellation proceeding in front of the Trademark Trial and Appeal Board (TTAB) or a claim for cancellation in federal court. In other words, some stones are better left unturned.
- How strong is your client's infringement claim? Is the purported infringer actually using the mark as a trademark? If so, is there any likelihood of confusion amongst consumers? Do the risks of negative publicity outweigh sending a cease and desist letter on a tenuous claim?
- How invested is the infringer in the mark? Has the infringer been using the mark as their name for many years? Or has the infringer only just started using it?
- How widespread is the infringement? Is the infringer using your client's trademark in a nationwide media campaign, or is the mark merely being used on the infringer's Pinterest board? If the mark is solely used on a social media page, might a takedown request to the social media provider be a more efficient, cost-effective and less risky alternative?
- Has the infringer been subject to trademark infringement claims in the past? If so, how has it dealt with them? Did they settle? Did they retain an attorney? Did they litigate? You would be amazed at what a simple Google or PACER search can uncover.



Ultimately, the answers to these questions will assist you in determining whether to send a cease and desist letter at all, and, if so, the form, style, tone and substance of the letter.

*Form*

Lawyers are an overly formal bunch. And there is nothing more formal than a cease and desist letter full of legalese on law firm letterhead. Candidly, many clients likely pay for that cloak of authority, rather than the substance of a letter, given that there are countless boilerplate cease and desist templates littered across the Internet that clients could copy and send themselves. However, a lawyer must always question whether a formal cease and desist letter will lead to the most cost-effective, desirable result for the client.

For example, if the infringer is a small, family-run business and the client's goal is to eliminate the infringement, why not call the infringer and speak with them about it? Or, if you want a record that you notified the infringer, why not send them a less formal e-mail? Experience shows that formality, especially when coming from an attorney, is often met with hostility and skepticism. The last thing your client wants in this situation is to get another lawyer involved. Formality will unquestionably increase the chance of that happening. And, if your letter is threatening, expect to receive an equally threatening letter in return. That opposing lawyer will likely want to show his or her client that its money was well spent on an aggressive advocate, rather than advise the client to comply with the demands in the cease and desist letter. Consequently, in this situation, an informal phone call or e-mail poses a much greater chance of success.

Informality offers additional, indirect benefits as well. First, it is often reciprocated. An opposing party is much more likely to make admissions during an informal phone call or e-mail exchange rather than in responding to a formal, threatening letter. Such admissions may range from acknowledging that they have heard of your client (evidence of intent) to acknowledging the infringement itself. Even if they are unwilling to cease the infringement, you now have admissions to use against them in court.

In addition to admissions, an informal conversation with an infringer often allows you to understand the infringer's point of view, investment in the trademark, and the context and scope of

its use. This information is frequently useful in crafting unique settlement arrangements. For example, if the infringer is completely dependent on the trademark to make a living, a coexistence or license agreement – or, minimally, an agreement to slowly phase out the infringer's use of the mark – may be a more persuasive financial pitch to the infringer than demanding the immediate elimination of the mark.

Additionally, informality greatly reduces the likelihood of social shaming. Informality, unlike its counterpart, is rarely met with hostility. An informal phone call cannot be posted on a message board or Twitter feed for all the world to forever see, and an informal e-mail will not be viewed in the same negative way as a formal, threatening letter from a corporate giant such as Chick-fil-A.

Now, contrast a small infringer with a large infringing corporation. Here, the risk of social shaming is minimal. A formal cease and desist letter is the appropriate and recommended form of communication when dealing with large companies. Large companies have seen it all, have their own in-house counsel, and have received plenty of cease and desist letters in their time. The goal with large companies is to move the issue up the chain of command as quickly as possible to someone with the authority to make the decision to end the infringement. An informal e-mail or phone call most assuredly will not be met with the same sense of urgency as a formal cease and desist letter.

*Style and Tone*

Even in situations where a formal letter is justified, it should not be overly threatening. One would be amazed at what can be achieved by being firm, but respectful and professional. Many lawyers, for some reason, cannot control the urge to expressly verbalize the ramifications of noncompliance. To them, one cannot aggressively advocate for a client without making an express threat. In reality, it is that unnecessary, antagonistic threat that will encourage disobedience and make an infringer believe that your client is posturing. If the client has gone to the trouble to hire a trademark litigator, it should be presumed that the client is willing to take the next step. Even with a large corporation, hostility is traditionally met with hostility. Express threats serve only to add fuel to the fire.

If the client's goal is to eliminate the infringement, rarely is an over-the-top, threatening cease and desist letter advisable. Only in cases of obvious, widespread and intentional infringement of a strong trademark by a persistent offender would an overtly threatening letter be justified.

*Substance*

Most cease and desist letters are devoid of substance. Instead, they only tend to emphasize the size and might of your client, the ramifications of noncompliance, and the substantial (yet abstract) damages available to plaintiffs in trademark actions. However, a well-reasoned letter will go a long way toward convincing the other party that they are in the wrong or, at the very least, that they are facing a formidable adversary. Moreover, a clear, articulate and reasoned letter serves to minimize the damage in the event the infringer seeks to "shame" your client on the Internet or liken your client to a trademark bully. A letter that is tailored to the facts of the case and clearly articulates the actions of the infringer that constitute infringement will not garner the grassroots support needed for a successful shaming campaign that a barebones, chest-puffing, predatory threat would. In short, you want the reader of the letter to be left with the impression that you are intelligent and professional – not that you are an intimidating bully.

**Conclusion**

Cease and desist letters remain an essential tool to cost-effectively resolve issues and avoid litigation. However, they are only a tool if used appropriately. Gone are the days when an attorney can ever so slightly modify an existing boilerplate letter and send it to a potential infringer. If the goal is to truly resolve the matter and minimize the risk of negative publicity (it better be), the claim for infringement must be extensively and objectively investigated in order to customize the letter to the issue at hand and present a well-reasoned position to the purported infringer, without overzealous posturing and passive-aggressive threats. In other words, in light of the inherent risks, you are advised to govern yourself accordingly.

**Endnotes**



**Drey Cooley**

1 Drey Cooley is a shareholder at Capes, Sokol, Goodman & Sarachan, P.C. in St. Louis. He is a 2006 graduate of the University of Michigan School of Law.

2 15 U.S.C. § 1051, *et seq.*

3 *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 521 (E.D. Mo. 1991).

4 *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

5 *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1308 (8th Cir. 1997).

6 *Id.*

7 *Southwestern Bell Yellow Pages, Inc. v. Wilkins*, 920 S.W.2d 544, 548 (Mo. App. E.D. 1996).

8 *Cynergy Ergonomics, Inc. v. Ergonomic Partners, Inc.*, No 4:08-CV-243 (JCH), 2008 WL 2064967, at *2 (E.D. Mo. May 14, 2008).

9 AM. INTELLECTUAL PROP. LAW ASS'N, REPORT OF THE ECONOMIC SURVEY 2015 38 (June 2015), *available at* http://files.ctctcdn.com/c79ee274201/b6ced6c3-d1ec-4ee7-9873-352dbe08d8fd.pdf.

10 *See e.g.*, *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1391 (8th Cir. 1991) (defendants "uniquely aimed [infringement] at forum state" when conduct continued after receipt of cease and desist letter). *Id.*

11 15 U.S.C. § 1064.3 (petition for cancellation may be filed for any mark that has been deemed "abandoned").

12 Bianca Slota, *A Monster Win for Rock Art*, WCAX.COM, (OCTOBER 21, 2009), http://www.wcax.com/story/11362590/a-monster-win-for-rock-art.

13 *See* https://twitter.com/search?q=%23monsterboycott.

14 Slota.

15 Jeff Weinstein, *Chick-fil-A: Stop Bullying Small Business Owners*, CHANGE.ORG, https://www.change.org/p/chick-fil-a-stop-bullying-small-business-owners.

16 Christina Park, *Chick-fil-A Fails to Stop "Eat More Kale" Trademark*, FORBES (Dec. 15, 2014, 5:35 PM), http://www.forbes.com/sites/christinapark/2014/12/15/chick-fil-a-fails-to-stop-eat-more-kale-trademark/#3f8e79662268.

17 *Id.*

18 Weinstein.

19 *Chick-fil-A Will Fight to Protect "Eat Mor Chikin" Trademark*, QSRWEB (Dec. 5, 2011), http://www.qsrweb.com/news/chick-fil-a-will-fight-to-protect-eat-mor-chikin-trademark/.

20 EAT MORE KALE, Registration No. 4,795,440; *see* https://trademarks.justia.com/854/12/eat-more-kale-85412053.html.

