```
 1                     UNITED STATES OF AMERICA
                     SOUTHERN DISTRICT OF ILLINOIS
 2

 3   ANNE SCHLAFLY CORI, et al.,   )
                                   )
 4                  Plaintiffs,    )
     v.                            ) No. 3:16-cv-00946-DRH-RJD
 5                                 )
     PHYLLIS SCHLAFLY'S AMERICAN   )
 6   EAGLES, et al.,               )
                                   )
 7                  Defendants.    )

 8

 9                   TRANSCRIPT OF PROCEEDINGS

10           BEFORE THE HONORABLE REONA J. DALY
                UNITED STATES MAGISTRATE JUDGE
11
                        May 29, 2018
12

13

14

15

16

17

18

19

20

21   REPORTED BY:      Christine Dohack LaBuwi, RDR, RMR
                       Official Court Reporter
22                     301 West Main Street
                       Benton, Illinois  62812
23                     (618) 439-7725
                       Christine_Dohack@ilsd.uscourts.gov
24
     Proceedings recorded by mechanical stenography, produced
25   by computer-aided transcription.
```

```
 1   APPEARANCES:

 2   FOR INDIVIDUAL PLAINTIFFS:

 3                        Eric D. Block, Esq.
                         Erik O. Solverud, Esq.
 4                       SPENCER, FANE
                         One N. Brentwood Blvd., Suite 1000
 5                       St. Louis, MO  63105
                         (314) 863-7733
 6                       eblock@spencerfane.com
                         esolverud@spencerfane.com

 7

 8   FOR PLAINTIFF EAGLE FORUM:

 9                        Jessica A. Powers, Esq.
                         SMITH AMUNDSEN LLC
10                       120 S. Central Ave., Suite 700
                         St. Louis, MO  63105
11                       (314) 719-3720
                         jpowers@salawus.com

12

13

     FOR DEFENDANT PHYLLIS SCHLAFLY'S AMERICAN EAGLES:
14
                         Nelson L. Mitten, Esq.
15                       RIEZMAN, BERGER, P.C.
                         7700 Bonhomme Ave., 7th Floor
16                       St. Louis, MO  63105
                         (314) 727-0101
17                       mitten@riezmanberger.com

18

19

20

21

22

23

24

25
```

```
1            (Proceedings began in open court at 9:30 a.m.)
2            THE CLERK:  Case No. 16-946, *Ann Schlafly Cori*,
3    *et al., versus Phyllis Schlafly's American Eagles, et al.*
4    Case is called for a motion hearing.
5            Will the parties please identify themselves for
6    the record?
7            MR. BLOCK:  Eric Block and Erik Solverud for the
8    individual plaintiffs.
9            THE COURT:  Good morning.
10           MR. SOLVERUD:  Jessica Powers for Eagle Forum.
11           THE COURT:  Good morning.
12           MR. MITTEN:  Nelson Mitten for PSAE and Eagle
13   Trust Fund.
14           THE COURT:  Good morning.  How is everybody doing
15   today?  Did we have a good holiday?
16           MR. SOLVERUD:  Good.
17           MR. BLOCK:  Good.
18           THE COURT:  Nothing squelches a holiday feeling
19   like a motion hearing on Tuesday morning.  But it was nice
20   while it lasted, right?
21           MR. MITTEN:  Yes, it was, Judge.  Thank you.
22           THE COURT:  All right.  Okay.  So, I have been
23   trying to get my arms around the best way to approach
24   today's hearing and not be here all day because, frankly,
25   I have other things this afternoon.  My thought is, the
```

motion to amend the scheduling order, I'm going to put off
until the end because I think we have a lot of things to
sort through before we have any real idea as to when good
times might be.

So, what I want to do is start with the motion for
the civil contempt.  And I'll start with plaintiffs,
obviously, and then I think that will lead into our
remaining discovery issues and we'll sort of wrap all of
that together, and then we'll address a plan.  And if we
get to the amendment of the scheduling order, great.
Okay?

MR. BLOCK:  Great.

MR. MITTEN:  Thank you.

THE COURT:  Eric, do you want to start?

MR. BLOCK:  Sure.  Thank you, Your Honor.  Eric
Block for the individual plaintiffs.

Your Honor, we have been at this, trying to get
these same documents for over a year and a half now.

THE COURT:  I'm aware of that.

MR. BLOCK:  Yeah, it's been going on since
December.  And, Your Honor, if I may approach?  We put
together a timeline, a timeline of everything that's gone
on involving, involving these particular documents.  It's
four pages.

And I think some of the high points to, to keep in

mind, we served PSAE with discovery requests in December
of 2016 and the deadline for that was ignored.  It took
multiple discovery dispute conferences just, just to get a
response.  It took five, five discovery dispute
conferences and six months for PSAE to produce a list of
e-mails that its officers and directors used.

It's just been constant and consistent
stonewalling.  And, you know, we're going to talk about
the scheduling order later today.  We are now on our
fourth -- this will be our fourth scheduling order.
Discovery has just ground to a halt.  And, I mean,
there's, there's two parties that are responsible for
that:  It's PSAE and Eagle Trust Fund.

We -- Eagle Trust Fund is similar in that we
provided a subpoena back in February.  It got ignored.  It
took us multiple discovery dispute conferences just to get
a response.  It was inadequate.  It took another discovery
dispute conference.  There were multiple requests for
extension.  And finally, after I -- it was six months
total for Eagle Trust Fund, it was seven or eight for
PSAE, we got a joint production of 3500 documents.

You know, just for the Court's information, in the
related Madison County case, it took two years there to
get any documents.

THE COURT:  So we're ahead of schedule?  Somehow I

don't think it works that way here.

MR. BLOCK: No, I don't think it does. And in that case, there's only two individuals that produce documents: Ed Martin and John Schlafly. They produced 110,000 documents, many of which are directly relevant to this case, that include the search terms that we had agreed to in this case, but were not produced. So, we're dealing with 125,000 documents in Madison County, a lot of which are relevant here. They weren't produced. That's going to be an issue that may be coming, as well.

But this is, this is part of a litigation strategy from PSAE and Eagle Trust Fund. We've got e-mails now in the other case that have been produced. I'll provide copies to everyone here. You can see that at the top there's an e-mail from Jeanne Schlafly. That's Bruce Schlafly, one of the trustees of Eagle Trust Fund. He says, "As we all agree, we are unwilling to let Solverud" -- Erik Solverud, my colleague here -- "and the Cori team take anything from our side unchallenged." This is in March 2017. This is while, while all the discovery issues are going on in this case, they say, *we're not turning over anything.*

If you go to the next e-mail in the packet, we've got John Schlafly's -- this is right before our initial production in PSAE. John Schlafly addressing Bruce,

saying that the e-mail search is complete. Said that
they'll be mounted -- "the e-mails will be mounted on some
kind a review system making it easier for the lawyers to
scan through rapidly, rejecting most, so that only a small
subset will be turned over to the other side."

This is -- this is their litigation strategy, to
drag this out, to delay, to -- to stonewall. And we've
seen that in action. I mean, you know, those of us in
this room have lived it. And we are here again with
another, another blown deadline.

As it relates to the, the privilege log, you know,
the reason we are here today, we received a privilege log
back in July that contained numerous communications
involving Roger Schlafly, Liza Forshaw, Eagle Forum's own
counsel; they withheld all of those as privileged. They
withheld those because they were damaging documents,
because they're harmful documents. We have had, I think,
three discovery dispute conferences on that issue alone.

We initially tried to work this out with counsel
for PSAE and Eagle Trust Fund. We were ignored and told
that they would be standing on all of their objections --
or all of their assertions of privilege.

Keep in mind, the initial -- the initial privilege
log didn't even raise the common interest; that was
something that came later at a discovery dispute

conference. So, we get to the discovery dispute
conference, we address all of these issues, leave thinking
we've got most of them resolved, to find out they're still
standing on all of their Roger Schlafly e-mails and
everything else. We brief this issue. We've had -- I
think now we're on our fifth amended privilege log because
there have been so many iterations.

A privilege log was ordered back in October. We
just got it. I mean, we just got a full, complete
privilege log in February.

After we go through all of the briefing, the Court
issues a thoughtful and thorough Order on February 1st.
Orders PSAE and Eagle Trust Fund to turn over all the
documents identified. That -- the Order could not be any
more clear. It addresses the issues related to Roger with
third parties, including Eagle Forum. It's clear in its
scope and its direction and it's clear in its due date
that those documents are due to plaintiffs by February
16th.

We reach out to counsel for PSAE and Eagle Trust
Fund and we get crickets for about two weeks. Then, come
to find out, they have appealed that Order. They appeal
it. We -- Judge Herndon, you -- not -- I mean, un -- I
mean, expectedly affirms. They then appeal it again. All
the while, that deadline is still sitting out there due,

1   no motion to stay was ever filed as required by Rule 8.
2   It just goes ignored.
3           Finally, after we go all the way up to the Seventh
4   Circuit, which also affirms, we reach out and decide that
5   they're -- informed that they're looking into their
6   rights.  And if they choose to obey the Court's Order,
7   they'll let us know.  They'll give us a response.
8           We go through -- several days later, the same time
9   they filed their response to our motion for contempt, we
10  got -- we got their documents, on May 9th.  So, a full
11  three months after they were due.
12          And when we got those documents, they're full of
13  redactions.  And I know we've, we've attached this to our
14  motion for contempt but I have included a hard copy for
15  the Court's reference.  So, this was attached as Exhibit 2
16  to our motion for contempt.
17          The Roger issue that's addressed squarely in the
18  Order that, that we discussed at three different discovery
19  dispute conferences, it shows up in this first page.  An
20  e-mail from Roger to John, a clear waiver if there ever
21  was attorney-client to begin with -- attorney-client
22  privilege to begin with, and we've got -- we've got
23  redactions.
24          THE COURT:  Well, but if I'm understanding this
25  e-mail correctly, the redaction is an e-mail from a

lawyer.

        MR. MITTEN:  Correct.

        MR. BLOCK:  Correct.  But as you can see, that
e-mail was forwarded to Roger Schlafly.  So, we've got
e-mails that -- with, with nonparties, strangers to this
case --

        THE COURT:  Oh, I don't think anybody's a stranger
to this case at this point.

        MR. BLOCK:  Siblings to parties in this case.  And
we've got, we've got redactions all over, all over these
documents, whether it's to Roger -- there's others that go
out to -- from Kathleen to Bruce, that are squarely within
the common interest decision that this Court issued, full
of redactions.  There's no set of facts where this
redaction is justified.

        If you -- if there was an attorney-client
privilege to begin with, as soon as it's provided to Roger
Schlafly, that privilege is waived.  And that's assuming
that he's not on all of these e-mails to begin with.
Which, based on a review of the privilege log, seems
unlikely.

        So that's, that's what we're dealing.  We're
dealing with, you know, these redactions after the fact.
They produced 250 -- 245 of the 1,000 documents that were
initially withheld.  There are a bunch of e-mails with

Roger Schlafly that are still being withheld.  That issue

-- we talked about that issue over and over again here,

and the Order specifically addresses it.

There's e-mails dealing with Liza with, with Eagle

counsel -- or with Eagle Forum.  Those e-mails are still

being withheld.  In addition, we've got e-mails that are

produced; attachments that are withheld.  We -- there's no

sensible way for us to -- you know, to justify, you know,

which documents they have decided to withhold and which

ones they decided to produce.

And the -- you know, sort of partial privilege log

that we got after the production, the 199 documents,

there's no sensible way to, to distinguish those documents

from the ones that are specifically contemplated by the

Order because they all were.

The Order is square on everything that is involved

in that, in that privilege log.  This is just another

attempt to delay this, this case.  And unless the Court

takes, you know, action to, to punish PSAE and Eagle Trust

Fund, we're going to continue with this for another year.

There's, there's nothing stopping them from, from

continuing to delay this proceeding.  You know, we've got

-- you know, after our last amended scheduling order,

we've got a trial date in December which, at the time, you

know -- these issues should have been resolved back in

early spring last year. They've since drug on because of some of the tactics that we're dealing with.

But at the rate we're going, there's, there's no way we're going to be ready for a trial in December at this point because we can't get the documents that, that we need to, to move this case because we're dealing with baseless privilege assertions; redactions of documents that clearly are no longer privilege, if they ever were; and we can't get PSAE or Eagle Trust Fund to even respond to us unless we're in front of this Court in a discovery dispute conference.

I've counted. I think we've been here or had a discovery dispute conference eight times. Eight times. And we're dealing with --

THE COURT: Really? I hadn't counted.

MR. BLOCK: Yeah. And, and all for documents that could've and should've been produced back in February or March last year. And it's not like we're -- you know, like we said -- like I said, there's -- the other case, we're dealing with 125,000 documents. Those were, those were actually produced from the time that the discovery vendor was contacted, to production, probably, you know, two or three months. And that's 125,000 documents. We're dealing with 4,000 here.

I mean, we're not talking about a huge volume of

documents. We're just -- what -- there's, there's no set
of facts where you can justify delaying production for a
year and a half. And I think some of these tactics just,
I mean, they, they show clear bad faith here and court
intervention is necessary to, to show PSAE and Eagle Trust
Fund that this sort of conduct can't continue. I mean,
this case will go on to, you know, 2030, if we go at the
pace that we're going.

THE COURT: Yeah, I'm a little bit concerned about
your deposition phase, too. I mean, I'm a little bit
concerned we're going to have -- we're going to be here
over and over or on the phone with that, too. I don't
have great confidence that magically everything is going
to start going well when we get through document
production.

MR. BLOCK: I agree, Your Honor. And I think you
can see in those -- in those e-mails that this is, this is
a strategy. This is not -- this is not just, you know, we
had overbroad discovery requests or, you know, our -- you
know, John -- John Schlafly still hasn't sat for his
deposition that was subpoenaed back in February. There's
-- you know, who knows if that will happen once we get
through documents. If it does, it's going to be -- you
know, at the rate we're going it's going to be a headache.

Every party we have tried to reach out to, to get

documents, we have gotten motions to quash.  In this case,
in the Madison County case, everything we have ever sent
out has gotten motions to quash filed against it.

It's a continuing -- it's continuing abusive
litigation tactics.  And, you know, we have also attached
as Exhibit 5 to our reply, Andy Schlafly, who is an
officer of PSAE -- or Director of PSAE, rather, I mean,
he's doing the same thing before Judge Ross.  And Judge
Ross issued sanctions.  That, that sanctions order has
been ignored.  But, I mean, it's become a problem in all
of this litigation, in this one, you know -- this one,
just like all the others, where -- that sort of side of
things.  But PSAE, Eagle Trust Fund, refuse to, refuse to
engage in discovery; ignore their discovery allegations.

There are multiple instances of court orders in
this case that were ignored, that were repeatedly asked to
be extended.  We reached out and came to agreed orders in
this case and those got ignored.  And it has to stop.  I
mean --

THE COURT:  Well, and, frankly, I see the problem
for you on this motion, and I haven't given it a great
deal of thought yet, is the motion came on the heels of
the appeals process.  And so while I appreciate the full
picture of things, the motion is on the heels, really
close in time to, he's exercising his rights.  Right?  And

1  that's what he's going to tell us.

2       MR. BLOCK:  Right.

3       THE COURT:  So, I mean, I'm a little concerned

4  about that.  No, I don't love how this has all taken place

5  and I have been here way too many times on this case.  But

6  the timing of the motion is a little concerning based on

7  where we are.  Yes, I want this to move on and I am

8  interested in any way we can get this case to move

9  forward.

10      So with that, would you like to respond, Mr.

11 Mitten?

12      MR. MITTEN:  Judge, first, I would like to say as

13 requested by the Court, I have the full privilege log.

14 I --

15      THE COURT:  Is that the same one that I already

16 have?

17      MR. MITTEN:  I e-mailed it, but you asked me to

18 bring you a copy.

19      THE COURT:  A bigger copy, that's right.

20      MR. MITTEN:  A bigger copy is fine.  I have one

21 for opposing counsel, also.

22      I segregated those out thinking it would be

23 simpler for the Court.  The highlighted ones were on the,

24 contained on the shorter log that we provided the Court on

25 the deadline date.

Like I said, I just made an assumption there that I would provide that rather than the others, but that was the nature of that. The next day, we filed that.

THE COURT: And I do want to go through that, but I'm interested in hearing your response to the motion, first.

MR. MITTEN: Judge, we have been responsive to regular discovery requests. The fight in this case has been over documents that we believe are privilege. And I understand that and that's what I'm saying, we have been asserting our rights as to that. And it has taken a long time to get that complete.

When the Order came down from the Seventh Circuit, we did have a technical glitch but we did produce the documents at that time. At that time, I recognized -- which I should have recognized before -- but I consider the breadth of the Order requiring us to produce other e-mails that were clearly just between counsel and their individuals. Those are segregated.

The balance the documents, and if there's some Roger Schlafly emails we overlooked, I apologize. My goal was to produce the Roger Schlafly e-mails. There are, I think, three or four in which we believe Mr. Schlafly was actually specifically requesting legal advice of us. We would request the Court to review those. Again, we're not

1    trying to hold back on the Roger Schlafly issue.

2           The one -- the Court's -- like I said, we have

3    been fighting over the issue of privilege.  And now, like

4    I said, the issue today I thought was going to be

5    initially just the e-mails between individual counsel and

6    their individual clients, not involving other people.

7    That ultimately showed up in the database that was

8    produced based upon the breadth of the e-mail that will

9    require the --

10          THE REPORTER:  I'm sorry.  That will require?

11          MR. MITTEN:  The requirement of the electronic --

12   that we discussed use of the terms and that sort of

13   things.

14          Again, our position is that basically we are -- we

15   have been litigating the issue of privilege here and that

16   has just unfortunately taken a long time.

17          THE COURT:  Well, and part of the reason why it's

18   taken a long time is because you were not terribly

19   responsive early on.

20          MR. MITTEN:  Correct.  And, for example, their

21   issue about, I turned over -- the electronic production

22   was really handled by Mr. Craney.  And if we have issues

23   concerning that, I'm happy to go back and revisit them.

24   But again, it's our position that we have been trying to

25   resolve these issues in a timely fashion with the idea

that we are asserting important rights here on behalf of
our clients and indirectly now on behalf of third parties,
because there are issues that need to be litigated.

One of the --

THE COURT:  Can I stop you there?

MR. MITTEN:  Sure.

THE COURT:  Because this is an important question
that I'm sure we're going to get to because they're going
through individual documents.  But why are you asserting
rights on behalf of third parties?  Why do you have these
e-mails that seem to be, on my quick review, seem to be
e-mails between other entities and their lawyers?  Because
that -- to me, that's your motion for clarification, is,
these are attorney-client privilege because these third
party entities have e-mails with their lawyers.  Why do
you have them?

MR. MITTEN:  Because they showed up on the
database.

THE COURT:  How did they get there?

MR. MITTEN:  Well, because we have similar --

THE COURT:  Did someone turn them over to you?

MR. MITTEN:  These people have different
positions.  For example, John Schlafly, who is trustee of
ETF and a board member of PSAE, is also being sued
individually.  So, he was clearly just using his computer

to send e-mails to his attorney representing Heyl Royster in the Madison County action.

Again, Kathleen Sullivan was a board member of Eagle Forum Education and Legal Defense Fund. And again, she was in their --

MR. BLOCK: That's not true. That's just not true.

MR. MITTEN: Okay. Excuse me. She was a board -- she was actually represented by Ian Northon in various matters. So those e-mails -- there was e-mails concerning them, concerning litigation in the Western District -- the Eastern District of Missouri to which she was a party to, because Mr. Northon was basically representing people in that case.

They -- again, John Schlafly was part of those. Ed Martin was a part of those. It's, it's -- unfortunately, it's the intertwining of these organizations that resulted in these e-mails showing up on the same computers as, technically, PSAE and ETF.

THE COURT: I don't recall this being brought up the last time we were together. The argument was all about common interest. And I feel like -- here's what I -- I feel like there -- everybody shared everything with everybody and now we are scrambling around to figure out how to protect it. I get that this is painful. I get

that there's going to be e-mails in there that your client
doesn't want turned over.  But I can't come back here
every time you have a new and novel argument that
something's protected.

MR. MITTEN:  And I apologize to the Court.  You
are correct in that I did not represent that accurately
but I felt the common interest doctrine would cover all of
these, so I apologize to the Court for that.  And -- but I
did feel under these circumstances, I still at least had
to present it on behalf of these individuals and my
clients.  So, I do apologize to the Court and opposing
counsel for that.

Again, we pointed out some of these details in our
memorandum.  We did not make the specific point about
those individuals, so I do apologize.  Again, our position
is the common interest doctrine would cover all of these.

THE COURT:  Are you getting that, Chris?

THE REPORTER:  Yes.

MR. MITTEN:  Pardon?

THE COURT:  You have a tendency to trail off at
the end of each sentence.

MR. MITTEN:  I'm sorry.  The common interest
doctrine would cover all of these.

THE COURT:  Okay.

MR. MITTEN:  Anyway --

1          MR. BLOCK:  Your Honor?

2          THE COURT:  Hold on.  He's still talking.

3          MR. MITTEN:  As to a few other issues in terms of

4    redactions, there were three points that the Court

5    actually left open in its February Order:

6          Communications between PSAE board members, which

7    were supposed to be reviewed by the Court;

8          The issue of work product privilege, which is part

9    of some of the redactions that were presented;

10          Document -- and then documents reviewed by other

11    counsel, which, they are claiming that everything has been

12    waived because Graves Garrett reviewed some of these

13    documents.

14          Some of the redactions, I will admit, on the

15    things produced were consistent with our position

16    concerning the individual communications.  At this point,

17    the ones that were presented to the Court today, if --

18    depending on the decision of the Court, we may go back --

19    we will go back and review those again in terms of whether

20    they are properly asserting the attorney-client privilege.

21    We will continue to assert those for work product.  We

22    believe those would have to be subsequently reviewed by

23    the Court.

24          THE COURT:  Well, and that's my thought.  My plan

25    is, I'm going to make a ruling with regard to the

arguments today, clarifying whatever we need to clarify
with regard to what's left on here.

MR. MITTEN:  Mm-hmm.

THE COURT:  And then at that point, if you insist
on still redacting or leaving things off, then we're going
to have to send them to the Court and the Court's going to
have to review them.

MR. MITTEN:  That's fine.  And again, the
communications between PSAE and board members, Judge,
again, those were specifically left open by the Court in
its Order which I think needs to be resolved.

And then finally, again, the documents reviewed by
other counsel.  That has not been briefed by, I think,
either side directly.  I am prepared to submit no later
than Friday a full brief on that issue.  We do not believe
that the mere fact that Graves Garrett reviewed these
documents waives any privilege, which the other side
believes it's been waived completely on the grounds, two
-- one, they did represent Eagle Trust Fund during this
period of time and, furthermore, the second one is the
longstanding precedent that basically a firm can retain
other individuals as their agents to review documents and
are not waiving the privilege, which is the way we handle
this and perceive this, by Graves Garrett assisting the
Craney firm and my firm in reviewing these documents.

1     Again, as to the delay, I do understand.  I agree

2  -- I have made numerous requests for deposition dates of

3  the plaintiff -- individual plaintiffs in this case.

4     THE COURT:  True, or not?

5     MR. BLOCK:  He's asked us for -- to get

6  depositions moving.  We don't have the documents yet.

7     THE COURT:  But you don't have the documents yet.

8     MR. MITTEN:  Well, Judge, like I said, I have

9  requested deposition dates.  Last I heard, it's not

10  required to produce -- finish all discovery, written

11  discovery before that.  I respected their position and did

12  not notice them up.

13     THE COURT:  Sure.

14     MR. MITTEN:  But I am happy to move forward on the

15  depositions.  My position is, what we are arguing over at

16  this point in time are privilege documents which they may

17  not even have been entitled to, some of which we -- the

18  Court may or -- has already ruled they're not entitled to

19  all of them.

20     THE COURT:  But they have no idea what's in the

21  documents --

22     MR. MITTEN:  I understand that.

23     THE COURT:  And --

24     MR. MITTEN:  And I understand that.  But again,

25  these are -- my position is, they aren't the plaintiffs in

the case.  They needed to have their information prepared at the time that they filed their case, and I'd be happy to inquire about that.

But again, I understand the issue and we are happy -- you know, we are willing to -- we want to move forward, too.

THE COURT:  Okay.  Anything else you would like to say on the contempt issue?

MR. MITTEN:  Not at this time.

THE COURT:  Do you have a response on the contempt issue?

MR. BLOCK:  Your Honor, on the contempt issue, under the rules that are required to request a stay and post a bond, that bond is important.  It allows something for, for us to attach to on the basis of, of the appeal. I mean, that, that appeal, you know, we feel like it was groundless.  It would have provided us some relief -- that bond would have provided us some relief as a result of it, and it would have provided some deterrent -- some, some level of deterrence for them to continue to appeal this Court's Order.  They didn't do any of that.  They, they didn't request the stay.  They didn't post a bond.  They just ignored the Court's deadline.

As to the point about James -- James Craney handling the review process.  You know, I think it was at

our second discovery dispute conference in this case, we found out that wasn't true. It was Graves Garrett that was handling this review process. We have since come to learn that the discovery vendor is out in Kansas City. That's where Graves Garrett is based. It was -- it wasn't James Craney taking the lion's share of this, you know, counsel to Eagle Trust Fund. It was Graves Garrett, counsel to Eagle Forum Education and Legal Defense Fund, EFELDF, that was handling this entire review process.

EFELDF is a stranger to this case. It has not been subpoenaed. It was handling the review process. It reviewed these documents. It hosted these documents and, and ultimately produced these documents. In fact, the latest amended privilege log that we received came from them. It was Eagle Forum Education and Legal Defense Fund's privilege log. It was titled clearly as such, on the title of the privilege log. Eagle Trust Fund, nowhere to be found.

The comment about another firm being retained to help review documents? A client retains a reviewing firm to, to assist in reviewing that client's documents. You don't hand over your documents to another party, which is what has happened here. You know, whether it's Eagle Forum Education and Legal Defense Fund handing over their documents to PSAE for its review and ultimate production,

or, or, you know, PSAE approaching a firm that represents
not PSAE but EFELDF to review PSAE's documents.  That's,
that's not hiring a third party to -- a document reviewer.
That's turning over your documents to another party.

THE COURT:  Mr. Mitten, how many lawyers do you
have in your firm?

MR. MITTEN:  We have a total of 24.

THE COURT:  And Mr. Craney's firm, how big is
that?

MR. MITTEN:  Two?  Three?

THE COURT:  Thanks.

MR. BLOCK:  And I think Graves Garrett is -- I
mean, it's, it's not a matter of numbers, Your Honor, of
attorney manpower.  It -- you know, we're dealing with --
we're dealing with 5,000 documents?  You can get through
those pretty quickly.  We -- like I said, we -- 125,000
documents were just produced in the other case.  Three of
us at our firm have been able to go through all of that.
It's not -- that's not the challenge here.  The issue is
that they just handed the documents over to another party.

Your Honor, I think the timeline is important as
it relates to the blown deadlines because it shows a
pattern of contempt for this Court.  And, you know, Mr.
Mitten's comment that he wants to move this case forward,
I mean, we have all been here.  That, that is not the

case. We have asked for John Schlafly's deposition. We haven't gotten it. We have asked for documents in this case, and each one our requests has been ignored until we've -- forcing us to come get court intervention. And then the Court issues its Order and ultimately that gets ignored or we get a little piece.

It's been a year and a half for 5,000 documents, or 4500 documents, and we're still not there. We get a little bit every single time, which shows just a pattern of trying to delay this litigation.

THE COURT: And I do have to say, I don't understand, when the Order came out on February 1st, why we didn't understand until the Seventh Circuit ruled on the writ of mandamus that we needed to be getting those documents organized and together. Maybe that's just me, but I'm just an overachiever in that respect. But when I got that Order --

MR. MITTEN: Maybe, Judge. Maybe you are. And I apologize again. No -- I mean, they were fairly well organized, it was just one final review. Again, part of the issue is this technical glitch which we worked through finally and, basically, had to produce new Bates numbers on it because of that.

Again, can I say one more thing in terms of this, Judge? And maybe I misunderstood. Mr. Craney's assistant

basically was responsible, from my understanding, for the extraction process. Graves Garrett did assist us in terms of other issues. But Mr. Craney was basically primarily in charge of the extraction process based upon the e-mails and those sort of things.

THE COURT: You mean, collection of the e-mails --

MR. MITTEN: Collection of e-mails, yes.

THE COURT: -- from the individuals?

MR. MITTEN: Collection from the actual individuals.

MR. SOLVERUD: But not the, not the review process?

MR. MITTEN: No. Graves Garrett was in charge -- was involved with the review process. I'm not denying that.

MR. SOLVERUD: This is, this is -- we have actually heard three different stories now about that. Because way back when, way back when this all started, James Craney said he was the guy doing the review. And it was, *I'm just a solo practitioner, I don't have enough time, I only got -- it's just me and we've got all this review.*

And then we were shocked to see -- because if you look in their reviewing firm, yeah, we were shocked because after him coming and telling this Court that he,

1      you know, he's so overwhelmed and, you know, it appears he

2      reviewed less than --

3             MR. BLOCK:  Thirty?

4             MR. SOLVERUD:  -- thirty documents.  And now -- I

5      think even today he said James Craney was reviewing

6      documents and now it's: *well, he was actually extracting.*

7             MR. MITTEN:  No.

8             MR. SOLVERUD:  *And Graves Garrett is reviewing.*

9      But it's actually not even that.  It's:  *James Craney was*

10      *doing some reviewing, but only a fraction of the*

11      *reviewing.*

12             Graves Garrett was apparently doing a lot of

13      reviewing.  You know, there, there is an interesting thing

14      going on right now and then we hear about this glitch

15      issue?  And we don't know what's going on with this glitch

16      with the vendor, but we do know that Graves Garrett is

17      nowhere to be found in this case anymore.  To our

18      knowledge, they have withdrawn from any representation in

19      all of the different litigations.

20             What we think happened is, somehow Graves Garrett

21      wasn't getting paid in the review documents and the

22      platform they were using, they don't have access to it

23      anymore so they went to a different review platform.  I

24      don't know --

25             MR. MITTEN:  That's entirely false.

```
 1          MR. SOLVERUD:  -- the software --

 2          MR. MITTEN:  On what are you basing these

 3    allegations?

 4          MR. SOLVERUD:  I'm basing it on the fact that

 5    Graves Garrett is no longer -- they're not representing --

 6          MR. MITTEN:  So.

 7          MR. SOLVERUD:  -- anybody in this case; right?

 8          MR. MITTEN:  Yeah.

 9          MR. SOLVERUD:  And in --

10          MR. MITTEN:  So?

11          MR. SOLVERUD:  -- any related litigation; correct?

12          THE REPORTER:  I'm --

13          MR. MITTEN:  That is correct.

14          MR. SOLVERUD:  And is it true that --

15          MR. MITTEN:  Why are you basing it on the fact --

16          THE COURT:  Okay.  One at a time.

17          MR. MITTEN:  What are your allegations based on,

18    Mr. Solverud?

19          MR. SOLVERUD:  I'm asking --

20          MR. MITTEN:  No, you just made an allegation.

21          MR. SOLVERUD:  -- is it true that now they're not

22    there and -- has the review platform changed?

23          MR. MITTEN:  Yes, the review platform --

24          MR. SOLVERUD:  So --

25          MR. MITTEN:  -- has changed.
```

```
 1          MR. SOLVERUD:  And did the Graves Garrett --

 2          MR. MITTEN:  Your Honor, I --

 3          THE REPORTER:  I can only report one at a time.

 4          MR. MITTEN:  It's now under my complete control.

 5          MR. SOLVERUD:  Okay.  And it wasn't before?

 6          MR. MITTEN:  The contract previously was with

 7     Graves Garrett.

 8          MR. SOLVERUD:  Okay.  And now it's no longer

 9     Graves Garrett.  And so what happens -- did the glitch

10     have something to do with the fact that we have moved from

11     one platform to another platform?

12          MR. MITTEN:  Yes.  That's what I explained in the

13     affidavit.

14          MR. SOLVERUD:  Well, actually, the affidavit

15     doesn't explain it that way.  The affidavit doesn't say

16     anything about that.

17          THE COURT:  I understand your concerns.  I

18     understand your response.  I'm not going to get caught up

19     on that piece of this.

20          Tell me, to the extent it's relevant, and really

21     I'm just trying to get my mind around what has happened,

22     why -- why was Graves Garrett retained to do this?

23          MR. MITTEN:  Just to assist us and try to get it

24     done more efficiently.  They had some additional manpower

25     that we felt we could use at the time.
```

1    THE COURT:  And they were at some point

2  representing parties in --

3    MR. MITTEN:  They represented Eagle Trust Fund

4  since last summer, or summer of 2016, I believe.

5    MR. BLOCK:  That's not at all clear, Your Honor.

6  And we have e-mails to that.

7    THE COURT:  Well, and I'll tell you, that sort of

8  leads into one of my other questions that, again, as

9  promised, we're going to get into.  But when I look at --

10  you provided in your response to the motion a list of who

11  represents who, and there's a whole lot of firms

12  representing a whole lot of people.

13    Is there a dispute from the plaintiffs that these

14  people were representing the entities listed?

15    MR. BLOCK:  Yes.  Yes, Your Honor.  I mean --

16    THE COURT:  Because that's my -- that's my

17  problem, is, I'm not -- we have your response that says

18  that but we have nothing that tells us.

19    MR. SOLVERUD:  There's no evidence.  There's no

20  affidavits about who represents whom on their side.  It's

21  all shrouded in secrecy.

22    MR. BLOCK:  Your Honor, I mean, as to Graves

23  Garrett in particular, you know, we have e-mails in this

24  most recent production in the Madison County case that

25  suggest that Graves Garrett was John Schlafly's personal

attorney, that he does not represent Eagle Trust, that he
-- he was -- that Graves Garrett was retained just to
represent John specifically in connection, it appears,
with contempt motions that are pending in Madison County.

So, we don't know.  I mean, we know that Graves
Garrett has entered on behalf of Eagle Forum Education and
Legal Defense Fund in the Eastern District of Missouri
case, but that's the only entry that they filed.  The
Eagle Trust Fund issue is -- is one that, you know, we
have seen in Mr. Mitten's papers.  But from our review of
the documents, they represented John individually and
perhaps no one else.

MR. SOLVERUD:  And in fact, this gets back to the
first time we were here on the privilege claim, is, it's
their burden.  And they haven't introduced affidavits as
to who represents whom.  They have lots of arguments but
no evidence.  And, and, you know, we don't -- it's not our
burden to get them to meet their burden.  If they don't
meet their burden, then they lose.  And they haven't.  And
they haven't come to this Court with affidavits.  The only
affidavit -- you know, we did see an affidavit from an
assistant about the glitch, but -- which didn't describe
the competing databases and the transfer or anything
related to that.

But, but, yeah, we have not seen -- we have not

seen engagement letters.  We have not -- you know, or, or

any indication that -- as to whom these parties are truly

representing.  And, if anything, that there is a, a huge

gray area even in their own internal communications about

who represents whom.  They can't even keep that straight.

MR. BLOCK:  Your Honor, they don't -- I mean, John

Schlafly, Ed Martin, they, they don't know who Riezman

Berger represents.  We have a huge question as to, you

know, who Nelson represents in this case.  So, it's not

necessarily unique to Graves Garrett.  It goes to all of

the attorneys on that side.  But we -- we haven't gotten

any evidence in this case in that regard.

And then just on the, on the issue of

clarification or a confusion by the Order, Your Honor,

PSAE and ETF appealed this two times.  There was no

mention of anything confusing about the order.  This issue

of clarification or dealing with documents in between

attorneys and their clients, you know, regardless of the

common interest, that wasn't raised.

This is, this is a new issue invented after the

fact to try to prevent the disclosure of these documents.

And to Nelson's earlier point about the issue of

Graves Garrett not being discussed?  We have discussed

this extensively.  We briefed it in our common interest

briefing and we, we covered this with the Court at our

last discovery dispute conferences.  None of this is new,
it's just that Nelson is waiting until it's time to, you
know, pay the piper, to turn over these documents, to
raise this issue to further delay.  That's -- and go
through a briefing schedule.  We don't need one.  The
Order contemplates it.

And, I mean, the time for briefing and, you know,
additional conferences, that's past.  And it's just
another delay tactic used by PSAE and Eagle Trust Fund.

MR. SOLVERUD:  And our concern is, is, we're going
to go through the same -- a motion to clarify if, you
know, we're going to then see another appeal even though
we -- our position -- this has already been ruled on.  All
of this has been ruled on in your Order.  I mean, these
issues were all briefed and all argued.  Now they have
come up with new arguments they want to reassert, but that
time has come and past.

And what they want is another, another order for
another appeal and another writ without a stay and, and
we're going to do this in some sort of piecemeal fashion.
That's not the way discovery works.  You had a deadline to
file a response.  You had a deadline for responding to the
motions to compel.  You have briefed those.  You don't get
to keep coming up with, you know, fashioning new arguments
and just kind of spoon feed all of this out and -- you

know, we don't know. I mean, this is -- but, you know, we
have every expectation this is part of a -- you know, so
we can do piecemeal appeals as well, I guess. And we'll
be 60 days, 90 days out, because they're going to view
every Order that comes, you know, trying to attack, you
know, every piece of this, this privilege log as a new
basis for appeal. I mean, that's already -- it's already
been ruled upon. We don't view the motion to clarify as a
proper motion and --

      THE COURT: Well, I'm not sure -- is it really a
motion or just a response?

      MR. SOLVERUD: Or the argument.

      MR. MITTEN: In response to the contempt, Judge.
I would have filed it as a whole new motion but --

      MR. SOLVERUD: Let me -- can I just make one
comment?

      THE COURT: Okay. One more comment and one more
response.

      MR. SOLVERUD: Most telling is when we called
Nelson about the issue of, *Okay, the writ is done, produce
the documents.* There wasn't, *Oh, yeah, we want to clarify
some things.* That wasn't the argument.

      I mean, just like it didn't come up on the appeal.
It didn't say, *well, we've got a motion. We're not sure
what our obligation is.* I mean, that's -- this is all --

it wasn't until the Court -- I think the Court on its own said, *Okay, this is what we're doing*, that we finally got now another point or another clarification that's needed.

THE COURT: Response.

MR. MITTEN: Judge, to me, the only issue that might be deemed to be new today are communications between individuals and their counsel as you indicated in your order -- as you indicated in your minute entry in the response to the motion to contempt. You specifically left open in your Order the issues concerning communications between PSAE board members, and you even -- work product privilege as well as documents reviewed by other counsel, you said, indicated specifically saying that had to come back to you, and came back to you. So, the Graves Garrett issue has not been ruled upon by the Court at this point. That -- the way I read your Order -- maybe I'm reading it incorrectly.

As to the representation issues. Every one of these, except for maybe one, has entered their appearance in a court of law on behalf of the parties we identified in various actions. The only ones I could think would be Kathleen Sullivan and perhaps Graves Garrett and Eagle Trust Fund, I thought they had entered their appearance in the Eastern District case. I will have to go back and check.

But the other parties have already entered their appearance on behalf of these parties in formal litigation. If we need additional affidavits to support that, we can provide those. But I thought by mere -- by indicating their representation in courts of law, they would be appropriate evidence. And I can provide that to the Court.

THE COURT: My problem is, I don't have access to that. So, I don't have anything in front of me that says that. I understand you all know a lot more about this than I do, but --

MR. MITTEN: I --

THE COURT: -- if you would like to supplement your response --

MR. MITTEN: I will supplement.

THE COURT: -- in the next, in the next five days to give me whatever you can give me to show they actually represent these people, that would be helpful to me.

MR. MITTEN: Is five days Monday then?

THE CLERK: Yes.

MR. MITTEN: Monday.

THE COURT: That would be fine.

MR. MITTEN: Thank you.

MR. SOLVERUD: Can we get dates of the engagements? Because it's relevant to --

```
 1          MR. MITTEN:  I think --

 2          MR. SOLVERUD:  -- the dates that they were

 3   engaged.

 4          MR. MITTEN:  I will agree to that.

 5          THE COURT:  So, by Monday you will provide me a

 6   supplement to your response to plaintiff's motion which

 7   includes representation --

 8          MR. MITTEN:  Sure.

 9          THE COURT:  -- and when it, when it occurred.

10          I'm not saying that's going to be dispositive of

11   what I do --

12          MR. MITTEN:  I understand, Judge.

13          THE COURT:  Okay.  Is there anything more you want

14   to say, Nelson, on the contempt issue?

15          MR. MITTEN:  Judge, again, we were asserting our

16   rights in this.  You are correct, I did not file a motion

17   for staying.

18          THE COURT:  Why not?

19          MR. MITTEN:  I'm not sure the bond would have

20   covered, because technically bond covers damages and I'm

21   not sure what the damages are except maybe attorneys' fees

22   in responding to the various -- you know, certainly on

23   behalf of our clients.

24          So, my attitude, I was asserting, and had the

25   other side moved to be a formal motion, I would have filed
```

```
 1   a motion for stay.  But --
 2          THE COURT:  But the rule requires you to do it.
 3          MR. MITTEN:  I understand.
 4          THE COURT:  Yeah, okay.  All right.  What I want
 5   to do at this point -- I'll take that motion under
 6   advisement.  What I want to do is, I want to understand
 7   what's left in the privilege log so that any further
 8   clarification that might be necessary, I can do that, if I
 9   decide that's the way to go.
10          So, I have in front of me a new privilege log with
11   some things highlighted, the majority not.  The things
12   that have -- my first question is:  The things that have
13   been produced already, are they off the privilege log?
14          MR. MITTEN:  They're off the privilege log at this
15   point.
16          THE COURT:  That's why there's not as many
17   documents, perhaps?
18          MR. MITTEN:  Correct.
19          MR. BLOCK:  Your Honor, we have a running
20   privilege log with everything.
21          THE COURT:  Okay.  Don't confuse me with facts.
22          MR. BLOCK:  Okay.  That's fair.
23          THE COURT:  But if I need to, that's helpful.  So,
24   my understanding --
25          MR. MITTEN:  And I can do the same thing, Judge,
```

```
 1   but I just --
 2          THE COURT:  I don't --
 3          MR. MITTEN:  -- I thought you wanted discrete
 4   while we continue to assert on the privilege log.
 5          THE COURT:  I think that's fair.  So, the things
 6   that are not highlighted, is there any dispute over those?
 7          MR. BLOCK:  Yes.
 8          THE COURT:  What is the difference between the
 9   things that are not highlighted and the things that are
10   highlighted?
11          MR. BLOCK:  We have no idea.  I mean --
12          MR. MITTEN:  Judge?
13          THE COURT:  Nelson.
14          MR. MITTEN:  Things that are not highlighted, we
15   think, fall under the Court's Order of being
16   communications between the PSAE board and its attorneys,
17   meaning us.
18          MR. BLOCK:  Your Honor, if you look at the first
19   one, row number one, which it's from Emmett McAuliffe, who
20   is with Riezman Berger.  Your Order contemplates that PSAE
21   board members -- John Schlafly's a board member of PSAE.
22   Ed Martin is, as well.  Bruce Schlafly is not.
23          THE COURT:  You keep saying Bruce, but it's
24   Jeanne.
25          MR. SOLVERUD:  That's his wife.
```

MR. MITTEN:  It's his e-mail --

THE COURT:  The e-mail is under his wife's name?

MR. BLOCK:  They share an e-mail which, which is another issue entirely.

THE COURT:  But anytime I see Jeanne, I should assume that's Bruce?

MR. BLOCK:  It's Bruce.  It's either Bruce or Jeanne.  She shows up in the e-mails, as well.

THE COURT:  Bruce is a brother but not a board member?

MR. BLOCK:  Right.

THE COURT:  Kind of like Roger.

MR. BLOCK:  Exactly.

THE COURT:  Okay.  So the first one, go ahead, is -- has Bruce or Jeanne --

MR. BLOCK:  It has Bruce or Jeanne and Andy, so this is clearly within the common interest ruling.  It's not between board members of PSAE and PSAE's counsel.  It's got Bruce Schlafly on it, who in this instance is no different than Roger.  So, I mean, you can see the dilemma we're in.  I mean, we're back to the same --

MR. MITTEN:  Bruce is a trustee of Eagle Trust Fund.

MR. BLOCK:  Which is, which is irrelevant.  There is no common interest, so why are these documents being

1  withheld?  We're back arguing the same issues over again.

2          THE COURT:  But Riezman Berger didn't represent

3  Eagle Trust Fund.

4          MR. MITTEN:  Yes, they do.

5          MR. SOLVERUD:  I hope you understand what our

6  position is, that's not privilege --

7          THE COURT:  Because he's not PSAE.

8          MR. SOLVERUD:  Right.

9          MR. BLOCK:  And, Your Honor, actually another

10  issue there, if you look at row number one.  So, that was

11  actually produced by Eagle Trust Fund.  It's responsive to

12  Eagle Trust Fund.  So, I mean, there's, there's so much

13  dissidence here that it's got PSAE's board members, PSAE's

14  attorneys, but it's an Eagle Trust Fund document that was

15  produced by Eagle Trust Fund.  In addition, it was

16  reviewed by the Craney law firm, which represents Eagle

17  Trust Fund here.

18          THE COURT:  So, when you say -- so the column that

19  says "responsiveness" and it says "responsive ETF," that

20  means ET produced it?

21          MR. MITTEN:  They had a response that --

22          THE REPORTER:  I'm sorry?

23          THE COURT:  I'm sorry?

24          THE REPORTER:  Say that again?

25          MR. MITTEN:  Yes, they did.

1　　　　　THE REPORTER:  Okay.  I don't know what you said,

2　　though.

3　　　　　MR. MITTEN:  Yes, they did.  Produce it.  I'm

4　　sorry.

5　　　　　THE COURT:  Okay.

6　　　　　MR. BLOCK:  Your Honor, we put together an outline

7　　that we think is helpful for the privilege analysis --

8　　　　　THE COURT:  Sure.

9　　　　　MR. BLOCK:  -- and we think addresses squarely

10　　most of the issues remaining on the privilege log.

11　　　　　THE COURT:  Are there any of these on this

12　　privilege log that you are not disputing?

13　　　　　MR. BLOCK:  I -- there's probably some that we

14　　don't have an objection to, Your Honor.  For example, if

15　　you look at No. 3?  John Schlafly to James Craney.  It's

16　　produced by Eagle Trust Fund and was reviewed by Craney

17　　law firm?

18　　　　　THE COURT:  Perfect.

19　　　　　MR. BLOCK:  So that one -- so -- but, but assuming

20　　with, with the caveat there -- and it's in this outline --

21　　as long as John Schlafly is acting in his capacity as a

22　　trustee of Eagle Trust Fund in that communication, then we

23　　have no objection.  That's privileged.

24　　　　　THE COURT:  Yeah, and I don't know how we're ever

25　　going to dissect that in this process.  Right now, I'm

```
1   still --
2          MR. BLOCK:  Right.
3          THE COURT:  -- way up here.  Okay.  So, there will
4   be some of those, but the majority you do have an
5   objection that they are still mixing common interest.
6          MR. SOLVERUD:  If you, if look at this analysis
7   outline we put together, it kind of shows you -- it's,
8   it's a decision tree on how you would get to documents, in
9   our view and in, in -- I mean, Nelson can correct us if he
10  thinks we've got this wrong -- but how you would find a
11  document that would be properly privileged and under the
12  privilege log and undisputed by us.
13         If you want to walk her through?
14         MR. BLOCK:  Sure.
15         I mean, Your Honor, the issues we covered
16  initially in our discovery dispute conferences as relates
17  to Roger Schlafly, Liza Forshaw, Runnymede, Smith
18  Amundsen, Ned Pfeiffer or Noreen McCann, those issues have
19  been addressed.  If they're on a communication, it's not
20  privileged.  It can't be.
21         So, if those individuals don't show up, you move
22  on to the next one.  Heyl Royster is a firm that
23  represents John Schlafly and Ed Martin, individually, in
24  the Madison County case.  If they show up on this
25  privilege log, those documents have been turned over to
```

PSAE and Eagle Trust Fund. Those cannot be properly privileged any longer. To the extent they show up in this privilege log, it's typically as one party among many. It falls within that common interest privilege that, that PSAE and Eagle Trust Fund were trying to raise. That issue has been decided so, if they're on it, it can't be privilege.

If you move to the Eagle Trust Fund. If a document has Ian Northon, who has entered his appearance for Eagle Trust Fund in, in the Eastern District of Missouri case, or James Craney, you can perform the analysis that we have underneath and ask whether it includes anyone other than John Schlafly and Bruce Schlafly, who are the two trustees of Eagle Trust Fund. If it includes any individuals beyond that, there has been a waiver. It's not -- I mean, not, not a waiver, it's just not a privileged document. If Roger shows up, it's not attorney-client privilege any longer.

Then at that point, you go up to see which party produced it. If the document was produced by Phyllis Schlafly's American Eagles, it's no longer an Eagle Trust Fund privileged communication. It's been turned over to Phyllis Schlafly's American Eagles and has been produced by them.

You then look to the reviewing attorney. And if

it was reviewed by counsel for Phyllis Schlafly's American Eagles, it's not privileged. It's been waived.

If, if the answers to all of those were no, that document's potentially privileged. Assuming that Bruce or John was acting in their capacity as Eagle Trust Fund, John is also represented by Ian Northon and in his capacity as trustee of the Phyllis Schlafly Revocable Trust, if that's the capacity he's acting in, that document is no longer privileged.

As it relates to Riezman Berger, the analysis is, is very similar. You look to see if there's anybody on the communications apart from the board members of PSAE. If the answer to that is yes, that document is not privileged.

You then look to see if it was produced by Eagle Trust Fund. If it was produced by Eagle Trust Fund, it's been turned over to a third party, it cannot be privileged. And you have the same -- sort of the inverse of the reviewing firm. If it was reviewed by Graves Garrett or Craney Law Group, the privilege has been waived.

So, we've gone through a few iterations of this to figure out what's the best way to attack this privilege log, and this is what we have come up with. And, and I think it addresses cleanly just about every, every

```
 1    document that's, that's in the log.

 2          THE COURT:  Okay.  I'm going to let you respond in

 3    just a second.  So --

 4          MR. MITTEN:  Judge?

 5          THE COURT:  But wait.  So, the documents that have

 6    been produced that have redactions, Nelson, are those --

 7    those are e-mails that fall under the Court's order that

 8    they be produced, but in the chain of that e-mail you have

 9    things that you are still trying to --

10          MR. MITTEN:  Correct.

11          THE COURT:  -- protect?

12          MR. MITTEN:  Yeah, either work product or, again,

13    attorney-client privilege.

14          THE COURT:  All right.

15          MR. MITTEN:  A unique issue for us.

16          THE COURT:  Would you like to respond?

17          MR. MITTEN:  Judge, I -- this is where the issue

18    between common representation and common interest

19    doctrine, to some degree, collide because we represented

20    two parties at the same time.  And so, just because we

21    represented two parties does not mean that both

22    communications are not covered by the attorney-client

23    privilege.  It is a common interest doctrine issue,

24    ancillary to it, but this is -- we represented the same

25    parties.
```

So, I don't know if that privilege was
automatically waived when that occurred.

        MR. BLOCK:  When --

        MR. MITTEN:  So that's the distinction that I
recall from this.

        MR. BLOCK:  When, Nelson?  I mean, I don't
remember when you entered for Eagle Trust Fund.

        MR. MITTEN:  I can't recall when I specifically
did, but we've been representing Eagle Trust Fund for a
long time, so I will get you those dates.

        But anyway, the -- what -- again, that's the
distinction here that to some degree the line needs to be
drawn.  And I understand the Court hasn't made that
decision, but that's where I drew the line here was
because of the dual representation issue as opposed to the
common interest doctrine.  And these would have obviously
fallen under the common interest doctrine as a matter of
course, but now I think we have an issue in terms of
mutual representation.  That's what I think is the vast
majority.

        The second aspect is again their argument that
anything Graves Garrett looked at is a third party,
therefore, the privilege is waived.

        THE COURT:  Let me ask you, before you continue.
So, plaintiffs' position is that they object to the

majority, if not close to all, of the things in this
privilege log.

MR. MITTEN:  Correct.

THE COURT:  You have prepared it, some redacted --
or some highlighted and some not.

MR. MITTEN:  Correct.

THE COURT:  What is the distinction in your mind,
why did you highlight some and not others?

MR. MITTEN:  The highlighted ones are the ones we
believe are communications between other counsel and their
respective individual clients.

MR. BLOCK:  Page one is Roger Schlafly.  Roger
Schlafly is not a party to any of the cases, and Ian
Northon does not represent him.  That's, that's the issue
that we're having a difficult time seeing the difference.
They look like the same documents to us.  There's more
Roger Schlafly communications.

THE COURT:  Why -- okay.  So let's look at
Document No. 9.  Why is that --

MR. MITTEN:  Judge, my recollection is, that one
was -- as I sit here right now, I do not know what the
document says.  I notice it is from Roger Schlafly to Ian
Northon.  As I indicated earlier, there were a few Roger
Schlafly e-mails that I thought were soliciting specific
advice.  I'd ask the Court to review it.  Again, that was

```
 1    the only -- that would have been the only reason that one
 2    would not have been included.
 3            MR. BLOCK:  Your Honor, 23 is the same way.
 4            THE COURT:  So, what he's saying is, Roger was
 5    soliciting advice from somebody else's attorney?
 6            MR. BLOCK:  Right.  23, you know, it's an e-mail
 7    with Roger on it, that he's taking the position that it's
 8    between individual clients and, you know, their attorney.
 9    Roger's not represented by anyone.  And Andy isn't
10    affiliated with the party producing or any of the parties
11    in the -- that are represented by Ian Northon.  There's no
12    distinction between the highlighted terms and the ones
13    that aren't.  They're just not privileged.
14            THE COURT:  Well, I will tell you that I am not
15    going to look at 745 e-mails.  So, I am going to figure
16    out a way that we can cull some of these out of here, and
17    that's --
18            MR. MITTEN:  And I respect that, Judge.
19            THE COURT:  -- going to take us a little bit of
20    time to get.
21            Right, Natalie?
22            LAW CLERK:  Mm-hmm.
23            THE COURT:  I'm not getting anything from either
24    side that tells me I don't have to at least go through all
25    of them in a privilege log and make some assessment;
```

1  right?  Other than you were saying, I've already ruled on

2  all of this and so it all should be --

3          MR. BLOCK:  Your Honor, I think --

4          THE COURT:  And, frankly, that sounded like a

5  pretty good resolution at this point.  I'm kidding.

6          MR. BLOCK:  I agree, Your Honor.  And I think that

7  this outline that we've put together addresses, you know,

8  sort of your Order and action.  And, you know, if Nelson

9  goes through and performs that sort of analysis and

10  produces the documents that clearly aren't privileged, we

11  don't have to come here again.  I mean, this issue is

12  over.

13          And, I mean, with, with respect to, you know, this

14  idea of common representation, I think it's also important

15  to note that we don't know who -- I mean, from our

16  perspective, we don't know who represents who,

17  specifically as it relates to Riezman -- Riezman Berger.

18  I -- we -- in the most recent production, Your Honor,

19  we've got e-mails between Ed Martin and John Schlafly

20  that, they have no idea who Riezman Berger represents.  To

21  the point that, you know, Ed Martin opines that Riezman

22  Berger's conflicted from representing Phyllis Schlafly's

23  American Eagles because they might represent Eagle Forum

24  Education and Legal Defense Fund.  There's also a -- an

25  interesting discussion of the Riezman Berger memo, which

1    we have seen in this case a few times.

2         But, you know, they talk about how the Riezman

3    Berger memo has nothing to do with -- little to do with

4    Eagle Forum Education and Legal Defense Fund.  It was --

5    the work for that was billed directly to Phyllis Schlafly.

6    And you have John Schlafly towards the bottom asking --

7         MR. SOLVERUD:  Which e-mail are you looking at?

8         MR. BLOCK:  I'm looking at the first page,

9    PSAE-005465, stating, "Who is Emmett's client?"  Their

10   clients don't know who they represent.  We're left to

11   guess, but their clients have no idea who they represent.

12        Your Honor, if you flip to the second e-mail,

13   which is Bates labeled PSAE-006043, there's a discussion

14   at the bottom of the page that says John Schlafly to Andy

15   Schlafly, cc'ing Bruce Schlafly and Roger Schlafly.

16   Again, this was a document that was withheld based on

17   privilege.  This is just a brotherly communication.

18   There's no attorney on it.

19        At the bottom of the page, they talk about

20   subpoenas that were issued, directed to Emmett McAuliffe

21   and his law firm Riezman Berger.  John opining that Emmett

22   wasn't careful to isolate his representation, and due to

23   that ambiguity his attorney-client privilege is under

24   attack.  We don't know who Riezman Berger represents

25   beyond PSAE, and his clients don't, either, you know,

whether it's Eagle Trust Fund or anyone else on his chart.

THE COURT: Okay. So, you're going to file your supplemental response --

MR. MITTEN: Right.

THE COURT: -- that sets out this representation.

And would you like an opportunity to supplement your reply, based on the supplemental response? Or somehow respond to that in whatever way seems appropriate?

MR. BLOCK: Yes, Your Honor.

THE COURT: So, you'll get another five days to do that.

And that may clarify some things for the Court. I'm concerned it really isn't going to. I'm -- but in any event, we'll --

MR. MITTEN: I will also review their, I guess, question tree and see if I have anything responsive for that.

THE COURT: I think that would be appropriate because I'm going to look at that.

MR. MITTEN: Yeah, I figured as much, Judge.

THE COURT: Yeah, okay.

MR. SOLVERUD: If we have to come back on this issue, can we ask -- can the Court order him to bring those documents with him? So that if we have to have an in camera inspection, that the Court can --

1      THE COURT:  Take them right then?

2      MR. SOLVERUD:  I just think, at this point, it

3   seems like -- we're not talking about this many documents,

4   we're talking about, you know, 750 at this point.

5      MR. BLOCK:  Yeah.

6      THE COURT:  Do you have all of these e-mails,

7   Nelson, in some --

8      MR. MITTEN:  Yes, we do.

9      THE COURT:  Well, not just have them, but have

10  them organized by the way the privilege log is set out, so

11  that it's just a matter of pulling them out and providing

12  them to the Court?

13     MR. MITTEN:  Correct, Judge.  I could probably

14  print them out this afternoon.

15     THE COURT:  Okay.

16     MR. MITTEN:  Actually, the legal assistant that's

17  really in charge of this is gone today, Judge, but.

18     THE COURT:  I'm not going to look at it today.

19     MR. MITTEN:  I didn't want to make that

20  representation when I realized -- I can probably do it.

21  It would take a lot longer.

22     THE COURT:  Okay.  And I'm just sitting here

23  searching for any way to narrow this down so that we're

24  not reviewing all them.  So, I won't make any decision

25  until we get your supplements.

1  　　　　MR. MITTEN:  Sure.

2  　　　　THE COURT:  And then we'll start going through

3  them.  Because I don't -- I don't understand -- in a way

4  -- some of those, I might be able to do without looking at

5  them, based on what's represented.

6  　　　　And I'm going to reserve the motion to amend the

7  scheduling order until I know -- if I say, *This is it,*

8  *it's all been decided, produce them,* we'll have your

9  scheduling order really quickly.  If not, then we're going

10  to have to see how long it's going to take to produce

11  them, which doesn't sound like it's going to be long.

12  　　　　MR. MITTEN:  No, Judge.  And again, I will say the

13  last time was more of the technical glitch we were trying

14  to work around.  At this point in time now, we just bit

15  the bullet and just had them produce new Bates number and

16  we can do that.

17  　　　　THE COURT:  And I will tell you that my flash

18  reaction on this kind of stuff is that, once it was

19  forwarded on, that that's waived.

20  　　　　MR. MITTEN:  I understand, Judge.  And I just -- I

21  felt that maintaining what I thought was a consistency

22  with the position, I was then taking with the court when

23  we did that.  I understand the Court's ruling on this and

24  I will -- I will remove those redactions at this time.

25  　　　　THE COURT:  So, is there anything -- so, on the

1  250-ish documents that have been produced, can we correct

2  that now?  Can you go ahead and -- if I'm telling you that

3  if an attorney-client privilege communication is forwarded

4  in a nonprivileged e-mail, that needs to be produced, we

5  can go ahead and do that.

6          MR. MITTEN:  Judge, if you -- I would prefer you

7  put it in the form of an order, but I will do that.

8          THE COURT:  Okay.  And any attachments to the

9  e-mails --

10          MR. MITTEN:  Correct.

11          THE COURT:  -- same.  Okay.  We'll do that.  We

12  can do that pretty quickly so at least you can get that

13  chunk of things.  And those 250 are no longer on this

14  privilege log.

15          MR. MITTEN:  Those are no longer on the log,

16  Judge.

17          THE COURT:  Okay.  All right.  I'm sorry, I don't

18  think we have really resolved anything today.  I just like

19  to see you every 60 days.

20          MR. BLOCK:  We enjoy it, Your Honor.

21          THE COURT:  We should just put it like on a

22  calendar, continuing appointment to be here.

23          MR. SOLVERUD:  It's already on our calendar.

24          THE COURT:  Just tell me when it is, I'll be here.

25  Okay.

1      MR. MITTEN:  If you could give us more ideas about
2  where to go eat in Benton?
3      THE COURT:  Yes, I can.  Up here on the square,
4  just about a block that way, is Seasonings Bistro.
5  Probably your best sit-down place in Benton.
6      And, Ms. Powers, you had nothing today?
7      MS. POWERS:  I thought they all did a very -- a
8  good enough job, I thought I'd sit here and observe today.
9      THE COURT:  We'll put you in charge next time.
10      MS. POWERS:  Exactly.
11      THE COURT:  Okay.  Thank you, everybody.
12      MR. SOLVERUD:  Thank you, Your Honor.
13      MR. MITTEN:  Thanks, Judge.
14      (Court adjourned at 10:46 a.m.)
15
16
17
18
19
20
21
22
23
24
25

1      REPORTER'S CERTIFICATE

2          I, Christine Dohack LaBuwi, RDR, RMR, Official

3    Court Reporter for the U.S. District Court, Southern

4    District of Illinois, do hereby certify that I reported

5    with mechanical stenography the proceedings contained in

6    pages 1-59; and that the same is a full, true, correct and

7    complete transcript from the record of proceedings in the

8    above-entitled matter.

9

10          DATED this 11th day of June, 2018,

11

12                      s/*Christine Dohack LaBuwi, RDR, RMR*
                        _____
13                      Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25