IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EAGLE FORUM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: 3:16-CV-00946-NJR-RJD |
| | ) |
| PHYLLIS SCHLAFLY'S AMERICAN | ) |
| EAGLES, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

Defendant Phyllis Schlafly's American Eagles, through counsel, supports its motion for

summary judgment as follows:

## I.      INTRODUCTION

Defendant Phyllis Schlafly's American Eagles ("Defendant") was started in 2016, at the

direction of and with the approval of Phyllis Schlafly, to address political issues in that

presidential election year. The core of Plaintiff Eagle Forum's ("Plaintiff") First Amended

Complaint is that Defendant is infringing and/or diluting the mark "Eagle Forum," as well as

some additional unidentified, unregistered marks, and engaging in "unfair competition."

Defendant has not used and is not using any of Plaintiff's marks in connection with any goods or

services. Further, Plaintiff's theories on unfair competition and lost profits are facially flawed.

No consumers have been purchasing any goods or services from Defendant. Both Parties are

non-profit entities that promote political ideologies and viewpoints.

There is no evidence to support Plaintiff's vague, shotgun-style First Amended

Complaint. It pleads eight causes of action: (I) Conversion, (II) Federal Trademark and Service

1

Mark Infringement, (III) Common Law Trademark and Service Mark Infringement, (IV) Unfair Competition under 15 U.S.C. § 1125, (V) Unfair Competition Under Illinois Law, (VI) Violation of the Lanham Act, 15 U.S.C. § 1125 – Dilution, (VII) Violation of 765 ILCS 103/65 – Dilution, (VIII) and Cyberpiracy in Violation of The Federal Anticybersquatting Consumer Protection Act.[1] All of these counts should be dismissed based on undisputed facts.

Count I fails because Plaintiff has not been wrongfully deprived of any "specific chattel" which it owns. Count II fails because Defendant is not using Plaintiff's marks in connection with any goods or services, because Defendant engages in non-commercial political speech, and because there is no likelihood of probable confusion.[2] Counts III-IV fail because Plaintiff has not pled any specific unregistered marks, nor can it demonstrate that any such marks are protectable. Counts V-VII fail because the trademark claims fail and because there is no substantial injury to "consumers." Count VIII fails because there is no bad faith intent to profit from any of Plaintiff's protectable marks. And, independent of any causes of action, the Court should dismiss Plaintiff's claim for lost profits because it raised more money in 2018 than it did in 2017, and because it cannot show Defendant caused any lost profits with reasonable certainty. The Court should enter summary judgment in Defendant's favor on all claims.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff is an Illinois non-profit corporation founded in 1975 by Phyllis Schlafly ("Phyllis") to advance politically conservative causes. Ex. B (Affidavit of John Schlafly), ¶ 4. Plaintiff's purposes include, without limitation: informing the public on "current national and

---

[1] Six individual directors also brought claims. Their claims were dismissed on June 17, 2019. *See* Memorandum and Order [Doc. 187].

[2] Defendant's Fourth Affirmative Defense pleaded the exercise of First Amendment Rights. *See* "Answer of Defendant PSAE to Plaintiffs' First Amended Complaint." [Doc. 43].

local subjects beneficial to the community," promoting "social welfare and individual freedom," and distributing educational literature to the public and sponsoring seminars and public meetings "to alert the public about present or proposed governmental actions, legislation, or policies." Ex. A (Eagle Forum Bylaws), Art. II.[3] Prior to creating Plaintiff, Phyllis founded Eagle Trust Fund ("ETF"), a separate organization, in 1967. Ex. B, ¶ 3. In 1981, Phyllis founded Eagle Forum Education and Legal Defense Fund ("EFELDF"), a non-profit corporation, for educational purposes and to further conservative causes. Id., ¶ 5. These entities operated jointly. For instance, Phyllis solicited subscriptions to the "Phyllis Schlafly Report," a political newsletter, and in solicitations made references to "Eagle Forum" and would request a "check made payable to: Eagle Trust Fund." Ex. J (Annual Renewal Notice for The Phyllis Schlafly Report in 2007). ETF published "The Phyllis Schlafly Report." Id.; Ex. K (Eunice Smith Depo.) 59:22-24, 60:1-5, 135:4-11.[4]

Plaintiff claims it registered the service mark, "Eagle Forum," with the US Patent and Trademark Office on August 7, 2001. First Amended Complaint, ¶ 17 [Doc. 40]. Phyllis, however, used the word "Eagle" for all of her organizations, including ETF and EFELDF. Ex. I (Dr. Bruce Schlafly Depo.), 28:2-23.[5] Phyllis believed and expressed that an "Eagle" referred to "all of those people that are drawn to her work and her issues and legacy over 70-plus years." Ex. F (Edward Martin Depo.) 364:11-15.

---

[3] Some exhibits contain more than one exhibit label. The additional exhibit label relates to how it was marked in depositions that have occurred in the case.

[4] ETF currently has two cotrustees: John Schlafly and Dr. Bruce Schlafly. Ex. I: 45:18-22, 70:9-16. Therefore, the Cori faction, discussed *infra*, has no control in ETF. The Cori faction also has no control in EFELDF.

[5] Dr. Bruce Schlafly is a director for EFELDF. Ex I: 143:2-4.

Plaintiff at all relevant times has been a tax-exempt entity under § 501(c)(4) of the Internal Revenue Code. Ex. L (Verified Madison County Complaint), ¶ 1.[6] Plaintiff was and is largely funded by discretionary third-party donations and investment gains. Ex. B, ¶ 10. Phyllis was a "terrific fundraiser," Ex. D (Depo. of Rosina Kovar): 81:1-19, and was responsible for virtually all of Plaintiff's financial and political success. Ex. B ¶¶ 10-11.[7]

In January 2015, Edward Martin was elected to succeed Phyllis as Plaintiff's president in a disputed vote. Ex. D: 88:2-15. In early 2016, Plaintiff had eleven directors: Phyllis, LaNeil Wright Spivy, Andrew Schlafly, John Schlafly, Kathleen Sullivan, Anne Cori ("Cori"), Eunie Smith, Shirley Curry, Cathie Adams, Rosina Kovar and Carolyn McLarty. Ex. L, ¶ 21; Ex. G (April 11, 2016 Board Meeting Minutes).[8] Plaintiff also had roughly $4,000,000 in cash and securities. Ex. B, ¶ 10. Phyllis and John Schlafly had signature authority over these assets. Id.

On April 10, 2016, Phyllis requested in writing that Cori and her faction – Eunie Smith, Shirley Curry, Cathie Adams, Rosina Kovar and Carolyn McLarty – resign from EF. Ex. H (Phyllis Schlafly Letter).  On a telephone call on April 11, 2016, Cori and five other directors removed Phyllis' and John Schlafly's access to the roughly $4,000,000 in assets over Phyllis' objections. Ex. G; Ex. B, ¶ 12. On April 22, 2016, Cori and her five cohorts filed a lawsuit in Madison County, Illinois against Plaintiff (as a "nominal defendant"), John Schlafly and Edward Martin. Ex. L.

---

[6] Defendant cites to the Verified Madison County Complaint for the purposes of establishing this tax status. In addition, 26 USC § 501(c) articulates the distinction between these classifications. For purposes of this case, the important distinction is that a § 501(c)(4) entity's donations are non-tax deductible, whereas a § 501(c)(3) entity's donations are tax deductible.

[7] Ms. Kovar was one of Plaintiff's directors. She left the board in 2017. Ex. D, 7:17-20, 10:16-18.

[8] The validity of this meeting, and the actions taken during the purported meeting, are disputed in another pending case. This document was prepared by Ms. Kovar. Ex. D, 76:6-11.

On or about May 12, 2016, "Citizen Empowerment League" changed its name to "Phyllis Schlafly's American Eagles." Ex. B, ¶ 13. Phyllis created and/or founded Defendant. Id. Defendant's directors as of May 12, 2016 included Phyllis, Edward Martin, Andrew Schlafly, John Schlafly and Kathleen Sullivan. Id., ¶ 14. A majority of those in control of Plaintiff at the time did not apparently support Donald Trump during the presidential elections. Id., ¶ 20. Therefore, Defendant was formed and/or re-organized in May 2016 to advance conservative principles, particularly those pertaining to the 2016 US Presidential Election. Id., ¶ 19. Defendant's mission is to "promote the Trump Agenda." Ex. F, 92:3-7. As such, it is "educational" and for the "public benefit." Id., 93:14-21. Defendant has never intended to sell, transfer, or assign the websites www.psamericaneagles.org or www.psamericaneagles.com to a third-party for gain. Ex. B, ¶ 21. Defendant is treated as tax-exempt under § 501(c)(4) of the Internal Revenue Code. Ex. F, 298: 22-24.

Phyllis was involved in the discussion of naming Defendant "Phyllis Schlafly's American Eagles." Id., 309:10-14. Neither Phyllis nor anyone associated with Defendant ever attempted to divert consumers, donors, or supporters from Plaintiff to Defendant. Ex. B, ¶ 18; Ex. F. 265: 14-18. Defendant operates at real property leased by ETF in Alton, Illinois. Ex. C (Defendant's Interrogatory Answers), # 11. At no point in time has Defendant exercised any control, dominion, or ownership over any of Plaintiff's money, intellectual property, mailing lists, personal property and/or PO Box. Ex. B, ¶ 17. Defendant has never sold any tangible products to the public. Id., ¶ 22. Defendant does not offer any services, labor, skill or advice for profit to the public. Id., ¶ 23.

On or about August 24, 2016 – after a majority of Plaintiff's board took steps to remove Phyllis from control of Plaintiff's assets – Plaintiff filed this lawsuit claiming, among other

things, unfair competition, lost donations and lost profits. First Amended Complaint, pages 18-19 [Doc. 40]. After Phyllis died, Cori and Eunie Smith were the "two primary fundraisers" for Plaintiff in 2017. Ex. D, 82:8-20. Neither is "as effective as Phyllis." Id. Plaintiff admitted, furthermore, that it raised more money in 2018 than 2017 from donations, fundraising and/or membership. Ex. E (Carolyn McLarty Depo), 16:1-15, 17: 1-15.[9]

## III.    SUMMARY JUDGMENT STANDARD

A court must grant summary judgment when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Rule 56).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir., 2018) (citing *Celotex*, 477 U.S. at 322). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999). Neither the "mere existence of some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 186 (1986), will defeat a motion for summary judgment. Similarly, "conclusory allegations by the party opposing the motion cannot defeat the motion." *First Commodity Traders v. Heingold Commodities*, 766 F.2d 1007, 1011 (7th Cir. 1985). Plaintiff must come forward with evidence of a genuine factual dispute. *Celotex*, 477 U.S. at 322-23. Even in the context of a trademark dispute, summary judgment is proper

---

[9] Ms. McLarty was Plaintiff's treasurer in 2017 and 2018. Ex. E, 10:20-22.

when the evidence is "so one-sided that there can be no doubt about how the question should be answered." *Door Systems, Inc. v. Pro-Line Door Systems Inc.,* 83 F.3d 169, 171 (7th Cir. 1996).

## IV.    COUNT I: MONEY, INTANGIBLE PROPERTY AND REAL PROPERTY HAVE NOT BEEN CONVERTED AND CANNOT BE CONVERTED

Conversion is any unauthorized act that deprives a person of their property permanently or for an indefinite amount of time. *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985). Conversion requires (1) the defendant's unauthorized and wrongful assumption of control, dominion, or ownership over the plaintiff's personal property, (2) the plaintiff's right in the property, (3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally, and (4) plaintiff's demand for possession of the property. *General Motors Corp. v. Douglass*, 565 N.E.2d 93, 96-97 (Ill Ct. App. 1990).

Conversion applies only to "specific chattel." *Mid-America Fire and Marine Ins. Co. v. Middleton*, 468 N.E.2d 1335, 1338 (Ill. Ct. App. 1984); *In re Thebus*, 483 N.E.2d at 1260 (conversion requires an "identifiable object of property"). Conversion does not apply to real property. *Sandy Creek Condo Ass'n v. Stolt & Egner*, 642 N.E.2d 171, 175 (Ill. Ct. App. 1994). Money may only be the subject of conversion if the money claimed, or its equivalent, at all times belonged to Plaintiff, and Defendant converted it to its own use. *Thebus*, 483 N.E.2d at 1261. "Intangible property rights cannot be the subject of conversion unless they are merged into a tangible document over which the alleged tortfeasor exercised dominion or ownership." *Film and Tape Works v. Junetwenty Films*, 856 N.E.2d 612, 624 (Ill Ct. App. 2006) (conversion claim improper for allegedly stolen confidential business information and/or contracts); *American Nat. Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008) ("Illinois courts do not recognize an action for conversion of intangible rights"). Such merger usually only applies to "promissory

notes, bonds, bills of exchange, share certificates, and warehouse receipts, whether negotiable or non-negotiable." *Id.* at 624 (citing Restatement (Second) of Torts § 242, at 473 (1965).

The supposedly converted property is "Eagle Forum's money, intellectual property, mailing lists, real and personal property and Eagle Forum's P.O. Box." First Amended Complaint, ¶ 50 [Doc 40]. Plaintiff acts as if ETF and EFELDF never existed, never had any ownership or use interest in the allegedly converted property and never had any role in the efficient political operation Phyllis created and operated. Nevertheless, it is undisputed Defendant has never exercised any control, dominion, or ownership over any of Plaintiff's money, intellectual property, mailing lists, personal property and/or PO Box. Ex. B, ¶ 17. Additionally, conversion as to "money" is otherwise improper because money is not an identifiable object of property. Further, the claim as to "intellectual property" – which is supposedly comprised of "goodwill and trademark and service mark rights," First Amended Complaint, ¶ 40 – is defective because such assets are intangible and there is no allegation or evidence that these rights have been merged into a tangible document. Conversion regarding the unidentified real property is flawed because conversion does not apply to real property. Conversion of the unspecified "personal property" is vague. Nevertheless, it is undisputed that Defendant has not converted any personal property of Plaintiff that actually belongs to Plaintiff. Ex. B, ¶ 17. Finally, a post office box is not subject to conversion because it is owned by the government and merely rented by a user. *Marin v. United States Postal Serv.*, No. 02-6176, 2003 U.S. App. LEXIS 21954, at *2 (2d Cir. Oct. 23, 2003) (no "constitutionally protected property interest in the post office box or mail forwarding services").[10]

---

[10] The USPS defines a PO box as a "premium service offered for a fee." *See* Domestic Mail Manual 508 Recipient Services, 4.0 Post Office Box Service: https://pe.usps.com/text/dmm300/508.htm#ep1052479 (viewed 8/13/19).

Plaintiff's conversion claims lack any evidentiary support and are insufficient as a matter of law. To the extent the conversion forms the basis for any of EF's other causes of action (e.g., unfair competition), those claims should also be dismissed.

## V.  COUNTS II-IV SHOULD BE DISMISSED

The Lanham Act serves two significant interests. First, it "secure[s] to the owner of the mark the goodwill of his business;" second, it "protect[s] the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). The Lanham provides different types of protection germane to Plaintiff's Counts II-IV.

As relevant to Count II, 15 U.S.C. § 1114(1)(a) guards against "infringement" – the "reproduction, counterfeit, copy or colorable imitation of a registered mark." As relevant to Counts III-IV, 15 U.S.C. § 1125 protects against "false designation of origin" – which is commonly referred to as a federal cause of action for unfair competition. *Cae, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 672-73 (7th Cir. 2001). A claim under § 1114(1)(a) applies only to federally-registered marks, whereas a claim under § 1125(a) may be based on unregistered, common law marks. Both claims hinge on a likelihood of confusion analysis. *Tally-Ho, Inc. v. Coast Community Coll. Dist.*, 889 F.2d 1018, 1025 n,14 (11th Cir. 1989) ("an unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim").

For Count II, Plaintiff must prove it has (1) a registered trademark, (2) that Defendant has used in commerce any reproduction, counterfeit, copy, or colorable imitation of the registered mark in connection with any "goods or services," and (3) there is a likelihood of confusion. 15 U.S.C. § 1114(1)(a); *Cae*, 267 F.3d at 673-74. For Counts III-IV, Plaintiff must show it has (1) a protectable mark, (2) that Defendant has, in connection with goods or services in commerce,

made a "false designation of origin" or "misleading description of fact," (3) and there is a

likelihood of confusion. 15 U.S.C. § 1125(a)(1); *Cae*, 267 F.3d at 673-74.

### A. Count II fails because Defendant does not sell goods or services and engages in non-commercial speech; further, there is no likelihood of probable confusion.

"Goods" and "services" under the Lanham Act are narrowly defined. A "good" is a

"tangible product sold in the marketplace." *Dastar Corp. v. Twentieth Century Fox Film Corp.*,

539 U.S. 23, 31 (2003). "Service" refers to an "intangible commodity in the form of human

effort, such as labor, skill, or advice." *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 323 (4th

Cir. 2015).

The Lanham Act does not apply to non-commercial political speech. *Taubman Co. v.

Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003) ("Lanham Act is constitutional because it only

regulates commercial speech"); *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2nd Cir. 1989)

("[b]ecause overextension of Lanham Act restrictions in the areas of titles [to a motion picture]

might intrude on First Amendment Values, we must construe the Act narrowly to avoid such a

conflict"); *Radiance*, 786 F.3d at 322 ("[a]t least five of our sister circuits" – the D.C., 10th, 9th,

6th, and 8th  - "have interpreted [in connection with the sale…advertising of any goods or

services] as protecting from liability all noncommercial use of marks"); *Seven-Up Co. v. Coca-

Cola Co.*, 86 F.3d 1379, 1382-84 (5th Cir. 1996) (§ 1125(a) applies only to "commercial

advertising or promotion"); *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 298

(D.D.C. 2017) (regarding advertisement expressing a political view, Lanham Act claim

dismissed because it was not commercial speech to promote a good or service). Commercial

speech is "speech which does no more than propose a commercial transaction." *Va. State Bd. of

Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). Thus, it is removed

from the "exposition of ideas" or the expression of "truth, science, morality, [the] arts in general" and other topics that characterize speech fully protected by the First Amendment. *Id.*

In *Radiance*, a non-profit organization focused on social issues authored and published an article criticizing the NAACP and used the registered "NAACP" mark. *Radiance*, 786 F.3d at 320. In response, the NAACP sued the non-profit for trademark infringement and dilution. *Id.* The district court found for the NAACP. On appeal, the Fourth Circuit observed Congress "did not intend for trademark laws to impinge the First Amendment rights of critics and commentators." *Id.* at 321. It further found that applying the Lanham Act to "noncommercial expressive and charitable activities" is incompatible with its purpose and "stretches the text beyond its breaking point." *Id.* at 322; *see Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) ("charitable appeals for funds…involve a variety of speech interests…that are within the protection of the First Amendment"). As such, the Fourth Circuit reversed the district court and found that the non-profit's non-commercial expression in no way infringed upon or diluted the NAACP's trademark rights. *Id.* at 332.

It is undisputed that Defendant does not sell or distribute any tangible products to the public. Ex. B, ¶ 22. It is equally undisputed that Defendant does not offer any services, labor, skill or advice for profit to the public. Id., ¶ 23. Accordingly, Defendant does not make use of Plaintiff's purportedly registered mark, "Eagle Forum," in connection with any goods or services. Defendant's activities, then, are non-commercial and outside of the Lanham Act.

Defendant's mission is to promote a politically conservative ideology and viewpoint for the public benefit. Id., ¶ 19; Ex. F., 92:3-7, 93: 14-21. It does not propose commercial transactions. Instead, it is engaged wholly in the exposition of political ideas as a 501(c)(4) entity. Ex. F, 298: 22-24. Defendant's name is part of its expressive right to comment on political

issues under the First Amendment in that it is tied to the substance of its speech and gives weight and credibility to its expressions and political activities. And, critically, Phyllis herself helped found Defendant. Ex. B, ¶ 13. Phyllis had the right to use *her own name* to advance *her own* political viewpoints. In spite of these protections, Plaintiff requests equitable relief enjoining Defendant from raising and expending money for political and/or speech purposes using the name "Phyllis Schlafly's American Eagles" or phrases including "eagle." *See* First Amended Complaint at Request for Relief, pages 18-19 [Doc. 40]. But Supreme Court precedent has long protected speech in the form of a solicitation to pay or contribute money. *Schaumburg*, 444 U.S. at 633 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). "Political speech is at the core of the First Amendment right." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 811 (7th Cir. 2014); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 312 (2010) (First Amendment applies to corporations). If the Court were to grant Plaintiff its requested relief, Defendant's ability to engage in political speech and political advocacy would be directly impaired and curtailed.

In the context of infringement, the Lanham Act is intended to "protect consumers from misleading uses of marks by competitors." *Radiance*, 786 F.3d at 323. The circumstances in this case do not fit within the text or intent of the Lanham Act. Two politically conservative non-profit entities are not "competitors" that have "consumers." To find otherwise would stretch the Lanham Act beyond recognition and weaponize its text to where it could be used to bludgeon an individual's or entity's non-commercial right to express ideas in his, her or its own name. This Court should decline Plaintiff's apparent invitation to allow trademarks holders to cloak

themselves in the Lanham Act and use trademark claims to assail political speech of defendants that do not sell goods or services.[11]

Plaintiff has further not shown any likelihood of probable confusion. "To decide whether there is a likelihood of confusion … a court must ask whether consumers, and specifically consumers who use either product, would be likely to attribute them to a single source." *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 455 (7th Cir. 2011); *Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1334 n.1 (11th Cir. 1999) ("analysis is the same [for trademarks and service marks] and courts thus treat the two terms as interchangeable in adjudicating infringement claims"). Seven factors are used to weigh likelihood of confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. *Ty, Inc. v. Jones Grp, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001). A court may grant summary judgment even if there is a genuine issue of material fact as to one or more of the seven factors, as long as no reasonable jury, looking at the seven factors as a whole, could conclude that there is a likelihood of confusion. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993). While no single factor is decisive, similarity of the marks, intent of the defendant, and evidence of actual confusion are the most important considerations. *Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989). "Possible

---

[11] The Supreme Court has recently struck down provisions of the Lanham Act for violating the First Amendment. The Lanham Act's prohibition on registration of "immoral" or "scandalous" trademarks violated the First Amendment. *Iancu v. Brunetti*, No. 18-302 (U.S. June 24, 2019). The Lanham Act's prohibition on registration of marks that "disparage" violated the First Amendment. *Matal v. Tam*, 582 U.S. __ (2017).

confusion is not enough; rather, confusion must be probable." *Sorensen v. WD-40 Co.*, 792, F.3d 712, 725 (7th Cir. 2015) (internal quotations omitted).

On its face, "Eagle Forum" is very different from "Phyllis Schlafly's American Eagles." Plaintiff has not presented any submissible evidence of actual confusion. There are obvious reasons for this. Because "Eagle" has been used to generally describe personal supporters of Phyllis – as well as ETF and EFELDF – it is impossible for Plaintiff to prove that "eagle" exclusively refers to "Eagle Forum."[12]  Ex. I, 28:2-23; Ex. F 364:11-15. The term was used broadly to refer to Phyllis and her political operation without any apparent regard to which legal entity did what; Phyllis began using the term for another entity (ETF) long before Plaintiff was even created. And while Plaintiff may argue about the use of PO Boxes and/or addresses in Alton, Illinois being the same or similar to what Plaintiff utilized, it is undisputed that these locations were also utilized by ETF. Ex. J. Defendant has never attempted to divert consumers, donors, or supporters from Plaintiff to Defendant, and thus Defendant has never attempted to "palm off" any "product" as that of Plaintiff's. Ex. B, ¶ 18 Ex. F. 265: 14-18. Further, the manner of use was different because Defendant was formed and/or re-organized to support then-candidate Trump in the 2016 US Presidential election when, on information and belief, a majority of those in control of Plaintiff did not seemingly support candidate Trump at the time. Id., ¶¶ 19-20.

Because Plaintiff cannot establish the existence of a triable issue of fact regarding Defendant's commercial use of "Phyllis Schlafly's American Eagles," and because Defendant cannot establish a likelihood of probable confusion, Defendant is entitled to summary judgment as a matter of law.

---

[12] Notably, the eagle is also a symbol or emblem of the US. It appears on US currency.

## B. Count III-IV fail for the same reasons as Count II and none of Plaintiff's alleged marks are protectable.

To be protected under 15 U.S.C. § 1125(a), an unregistered mark or name is categorized into one of five categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary or (5) fanciful. *Id.* at 1085; *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-78 (1992). Generic and descriptive marks cannot ordinarily function as trademarks. *H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496 F.3d 755, 759 (7th Cir. 2007). "A generic term is one that is commonly used as the name of a kind of goods." *Id.* "A descriptive term…is one that names a characteristic of a particular product or service." *Id.* "[A] descriptive mark may warrant protection if it has acquired secondary meaning." *Id.* A "secondary meaning" exists if the product name comes "to be uniquely associated with the original seller." *Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 483 (7th Cir. 2007).

As a threshold issue, Count III is insufficiently pled. Plaintiff vaguely alleges it uses "service marks, tradenames and trademarks in connection with its goods, services and fundraising activities…which…have not, as yet, been registered." *See* First Amended Complaint, ¶ 69.[13] There is no identification of what the mark or name is, nor is there any explanation as to what constitutes the "goods" and "services."[14] Relegated to mostly guessing what these unidentified, unregistered marks are, it appears that Plaintiff is claiming that "Our Eagle

---

[13] It is unclear how, if at all, Plaintiff's alleged "goods" and "services" are different from its "fundraising activities."

[14] These insubstantial allegations do not meet the standard of a 12(b)(6) motion to dismiss or 12(c) motion for judgment on the pleadings. Plaintiff has the burden to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009). A motion for judgment on the pleadings is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014).

Leaders," "my American Eagle leaders," "loyal supporters," "Phyllis Schlafly's Eagle Forum," or some variation of these phrases (collectively, "Alleged Marks") are the purported common law marks. *See Id.*, ¶¶ 43-44.

Most of the Alleged Marks, though, equally referred to ETF, EFELDF, and individuals who generally supported Phyllis. Ex. I, 28:2-23; Ex. F, 364:11-15. They were not exclusive to Plaintiff, nor is there any compelling evidence to suggest otherwise. In addition, the Alleged Marks are not protectable in that they are generic and/or descriptive. It is difficult to imagine a more generic phrase than "loyal supporters." Likewise, the remaining Alleged Marks merely described Phyllis and her "eagles."

There is nothing evidencing that each of the Alleged Marks has acquired a secondary meaning and are associated exclusively with Plaintiff. And even if the Alleged Marks were protectable, "Phyllis Schlafly's American Eagles" is not a "false designation of origin" or "misleading description of fact" because Phyllis was one of Defendant's founders and initial directors, and had input regarding its name. Ex. B, ¶¶ 13-14; Ex. F, 309:10-14.

Count III should be dismissed because there are no protectable trademarks and is no false designation of origin. Count IV for unfair competition is based on identical or substantially similar allegations as Count III. *See* First Amended Complaint, ¶¶ 73-76; *Tally-Ho, Inc.*, 889 F.2d at 1025 n.14 ("an unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim"). Summary judgment, then, should also be granted on Count IV.

**VII. COUNT V: NO UNFAIR COMPETITION UNDER ILLINOIS LAW IN THAT THE TRADEMARK CLAIMS FAIL AND THERE IS NO SUBSTANTIAL INJURY TO CONSUMERS**

To prevail on a claim for "unfair methods of competition," Plaintiff must prove (1) a deceptive or unfair practice by Defendant, (2) Defendant's intent that Plaintiff or others rely on the deceptive or unfair practice, and (3) that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Wigod v. Wells Fargo Bank, NA*, 674 F.3d 547, 574 (7th Cir. 2012).[15] In considering whether something is "unfair," courts weigh whether a defendant's conduct (1) violates public policy, (2) is so oppressive that the consumer has little choice but to submit, and (3) causes consumers substantial injury. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (citing *Robinson v. Toyota Motor Credit Corp*, 775 N.E.2d 951, 960-61 (Ill. 2002)). For an injury to be "substantial," it should not be outweighed by any countervailing benefits to consumers or competition that the practice produces or be an injury that consumers themselves could not reasonably have avoided. *Id.*

There is no unfair competition. Plaintiff's Count V for Unfair Competition merely restates and incorporates its allegations made in Counts I-IV. Because those counts should be dismissed, Count V should be dismissed. Critically, Plaintiff and Defendant do not have consumers in the context of unfair competition law. This is not a case where a company is trying to sell imitation iPhones using Apple's goodwill and trademark, nor is this a situation where someone is trying to ride H&R Block's trademarks to profit on tax related services. Instead, Plaintiff and Defendant promote political ideas to the public. To the extent Plaintiff and Defendant have "consumers," they are able to voluntarily choose which of the Parties to follow. Thus, there is no substantial injury to the public. Count V should be dismissed.

---

[15] The First Amended Complaint does not cite the specific legal basis for Count V. It seems to be based on the same averments made in Counts I-IV.

## VIII.   COUNT VI-VII: THERE IS NO DILUTION

Plaintiff's trademark dilution claim requires it show that (1) one or more marks is or are famous, (2) that Defendant adopted a mark after Plaintiff's mark became famous, (3) that Defendant diluted the mark, and (4) that Defendant's use is commercial and in commerce. *AM General Corporation v. Daimlerchrysler Corporation*, 311 F.3d 796, 811 (7th Cir. 2002). There are two principal forms of dilution: tarnishing and blurring. "Tarnishing" occurs when a junior mark's similarity to a famous mark causes consumers to associate the famous mark with a defendant's inferior or offensive product. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000). "Blurring" happens when consumers "see the plaintiff's mark used on a plethora of different goods and services…raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Id.* Under Illinois law, "dilution" is the "lessening of the capacity of a famous mark to identify and distinguish goods or services" regardless of competition or likelihood of confusion, mistake or deception. 765 ILCS 1036/5(c).

To the extent Plaintiff's claims in Counts VI-VII rest on the Alleged Marks, they are not subject to dilution for the reasons previously expressed. Similarly, as to dilution regarding Plaintiff's "Eagle Forum" mark, that claim fails based on the foregoing discussion because, among other things, Defendant's use of "Phyllis Schlafly's American Eagles" is non-commercial and "eagle" also referred to Phyllis' supporters, ETF and EFELDF. As a result, Plaintiff cannot demonstrate any "tarnishing" or "blurring."

## IX.   COUNT VIII: THERE IS NO BAD FAITH INTENT TO PROFIT

A claim for cyberpiracy under 15 U.S.C. § 1125(d) requires that EF prove that (1) Defendant had a bad faith intent to profit from a mark and (2) registers, traffics in or uses a

domain name that is (3) identical, confusingly similar and/or dilutive of the mark. Courts may consider numerous factors in evaluating whether "bad faith" exists. 15 U.S.C. § 1125(d)(1)(b).

The website addresses http://www.psamericaneagles.org and http://www.psamericaneagles.com are the subject of Count VIII. As expressed above, "Phyllis Schlafly's American Eagles" is not confusingly similar or dilutive of the "Eagle Forum" mark or Alleged Marks. Furthermore, there is no "bad faith" intent to profit from any marks. Phyllis was one of Defendant's founders and initial directors, and thus has the right to use her own name, initials, image and likeness. Defendant has never had any intention to sell either of these website addresses to a third-party for gain. Ex. B, ¶ 21. And, as discussed previously, Defendant was re-organized for specific political purposes regarding the pending US Presidential election. Count VIII should be dismissed.

## X.  PLAINTIFF CANNOT PROVE DEFENDANT CAUSED LOST PROFITS WITH REASONABLE CERTAINTY

"Recovery of lost profits cannot be based upon conjecture or sheer speculation." *Midland Hotel Corp v. Reuben H. Donnelly Corp.*, 515 N.E.2d 61, 66 (Ill. 1987). There must be evidence to "afford a reasonable basis for the computation of damages." *Id.* Unless Plaintiff can prove that Defendant's improper conduct caused lost profits, Plaintiff would be entitled only to nominal damages. *Id.* And because "lost profits are frequently the result of several intersecting causes, it must be shown with a reasonable degree of certainty that [Defendant's conduct] caused a specific portion of the lost profits." *Id.*; *TAS Distributing Co., Inc. v. Cummins Engine Co.*, 491 F.3d 625, 631-32 (7th Cir. 2007) (a claimant must establish lost profits with "reasonable certainty").

Plaintiff, a non-profit entity, cannot prove Defendant caused lost profits. Remarkably, Plaintiff's own treasurer admitted that there was "more money raised" in 2018 relative to 2017. Ex. E, 17:1-15. This increase in receipts wholly negates any claim of lost income. Even

assuming, however, that Plaintiff raised less money in 2018 versus 2017, the claim for lost profits would still be dubious. Plaintiff has historically been funded by discretionary third-party donations and investment gains. Ex. B, ¶ 10. These are inherently speculative and uncertain because investment gains unpredictably ebb and flow and third-party donations are erratic. Therefore, it would be impossible for Plaintiff to compute any sort of lost profits with reasonable certainty.[16] And, perhaps more problematic for Plaintiff, it will be unable to show Defendant *caused* any lost profits – particularly after a majority of Plaintiff's board instituted more than one lawsuit against other board members and marginalized and ousted its founder – the source of its fundraising – from control over its accounts.

## XI.    CONCLUSION

After nearly three years of litigation – including amended pleadings, motion practice and an adequate period of time for discovery – Plaintiff has not and cannot prove its claims. Based on the undisputed facts in the record, and the obvious inapplicability of much of the substantive law Plaintiff relies upon, Defendant respectfully requests that summary judgment be granted in its favor on Plaintiff's First Amended Complaint in its entirety.

---

[16] Plaintiff also apparently solicits and receives donations through a newly formed non-profit entity, "Eagle Forum Foundation." Plaintiff has issued a subpoena for this entity. Defendant has filed a pending motion to quash the subpoena and argued that it seeks "irrelevant" information. *See* Non Party Eagle Forum Foundation's Motion to Quash Phyllis Schlafly's American Eagles' Subpoena Duces Tecum [Doc. 191].

Respectfully submitted,

*/s/ Henry P. Elster*
Henry P. Elster, #62875MO
101 S. Hanley, Suite 1280
Saint Louis, Missouri 63105
(Telephone) 314-727-0868
(Facsimile) (314) 727-9071
(E-mail) henry@elsterlaw.com
***Co-Counsel for Phyllis Schlafly's***
***American Eagles***

***Admitted Pro Hac Vice***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 14, 2019, a copy of the foregoing and/or attached document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all of the parties of record.

*/s/ Henry Elster*
101 South Hanley, Suite 1280
Clayton, Missouri 63105