IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EAGLE FORUM, an Illinois Not-for-Profit Corporation,<br><br>      Plaintiff,<br><br>v.<br><br>PHYLLIS SCHLAFLY'S AMERICAN EAGLES, a Virginia Not-for-Profit Corporation,<br><br>      Defendant. | Case No. 16-CV-00946-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment ("MSJ") filed by Phyllis Schlafly's American Eagles ("PSAE") (Doc. 202). For the reasons set forth below, the Court grants the motion.

## FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Eagle Forum ("EF") is an Illinois not-for-profit 26 U.S.C. § 501(c)(4) corporation formed by Phyllis Schlafly in 1975 to support causes related to the modern conservative political ideology (Doc. 43, p. 6; Doc. 203-2, p. 2). Schlafly had earlier created the Eagle Trust Fund ("ETF") in 1967 (Doc. 203-2, p. 2). By all accounts, Schlafly was an adept fundraiser (Doc. 203-4, p. 23-24; 203-6, p. 218). In the decades since formation, EF achieved a relative measure of political and financial success, with a war chest of approximately $4,000,000 in assets as of 2016 (Doc. 203-2, p. 3). Schlafly subsequently created the non-profit corporation Eagle Forum Education and Legal Defense Fund

("EFELDF") in 1981 to educate and further elevate her political causes (*Id.*, p. 2). In 2001, EF registered the service mark "EAGLE FORUM," Registration Number 2475317, with the United States Patent and Trademark Office (Doc. 43, p. 5; Doc. 203, p. 3). In 2015, another 501(c)(4), Citizen Empowerment League, was created (Doc. 43, p. 9).

In a year fraught with contentious battles across the political spectrum, 2016 saw divisions appear in EF amongst the board of directors. During the Republican presidential primary, one group of the board of directors of EF supported Senator Ted Cruz while the other group, including Schlafly, supported Donald J. Trump as the nominee (Doc. 203, p. 5; Doc. 203-2, p. 4; Doc. 203-5, p. 12; Doc. 203-9, p. 26). In April 2016, three members of the board called for a board meeting, citing the bylaws of EF (Doc. 203-12, p. 49). Schlafly, questioning their intent, allegedly responded by requesting six members' resignations, including the three members who requested the meeting (Doc. 203-8, p. 2). The meeting was conducted the next day over the objections of Schlafly and one of her sons, who was also a board member (Doc. 203-12, 50). When the dust settled, the board voted to change leadership and make three of the six directors that Schlafly asked to resign signatories on EF's accounts (*Id.* at 51).

Doubtfully by coincidence, in May 2016, the newest 501(c)(4), Citizen Empowerment League, changed its name to PSAE (Doc. 43, p. 9). PSAE was comprised mostly of the minority board members, including Schlafly, and ex-leadership from EF (*Id.* at 10). PSAE allegedly focuses on educating the public on Schlafly's positions "related to the Trump agenda" (Doc. 203-6, p. 96).

This action arises out of claims originally brought derivatively by the six majority directors of EF against PSAE seeking injunctive relief for alleged violations of state and federal laws relating to intellectual property and commercial competition (Doc. 40). The individual plaintiffs in the original derivative action were subsequently joined by EF, formerly listed as a defendant, and the individual plaintiffs were subsequently dismissed (Docs. 36, 187). EF alleged claims for state law conversion; federal and state law trademark and service mark infringement, unfair competition, and dilution; and federal cybersquatting (Doc. 40).

EF claims that after the name change, PSAE solicited support and funds from supporters and donors of EF without permission, using EF's assets and resources including EF's money; intellectual, real, and personal property; mailing lists; and P.O. Box (Doc. 43, p. 11). PSAE denied the allegation but admitted to using Schlafly's name and image along with employing phrases like "Our Eagle Leaders," "my American Eagles," and "loyal supporters" who have been fighting "for decades" (*Id.* at p. 11). EF also alleges that PSAE registered two unauthorized websites, http://www.psamericaneagles.org or http://www.psamericaneagles.com, using EF's e-mail address (*Id.* at p. 10-11). PSAE admits registering the websites, but it states that it never intended to sell, transfer, or assign the websites to a third-party for gain (Doc. 203, p. 5).

On August 14, 2019, PSAE filed the instant MSJ and memorandum in support (Docs. 202, 203). EF then filed a Rule 56(d) motion, seeking to deny or defer consideration of the MSJ (Doc. 206), and subsequently filed its response to the MSJ on September 16,

2019 (Doc. 209). PSAE filed a reply to EF's response on September 18, 2019 (Doc. 210). EF next filed its motion to strike PSAE's reply, citing this Court's local rules (Doc. 211). The Court denied both of those related motions and now brings its attention to the underlying MSJ (Doc. 228).

## LEGAL STANDARD

Summary judgment is "the put up or shut up moment in a lawsuit" where a party lays its proverbial cards on the table, showing what evidence it possesses to convince a trier of fact to agree with its version of the events. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)). Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). That "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere conclusory allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Celotex*, 477 U.S. at 232-24. While the Court must view the evidence and draw all reasonable inferences in favor of the opposing party, "[i]nferences and opinions must be grounded on more than

flights of fancy, speculations, hunches, intuitions, or rumors[.]" *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)). A merely cognizable issue of fact is insufficient to deny summary judgment, and an opposing party must present sufficient evidence to enable a reasonable jury to render a verdict in its favor. *Anderson*, 477 U.S. at 251–52; *Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 643 (7th Cir. 2013). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

## ANALYSIS

### I. Conversion

#### A. Applicable Law

"The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) (quotation omitted). "To prove conversion under Illinois law, a plaintiff must show that: (1) he has a right to the property at issue; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Stevens v. Interactive Fin.*

*Advisors, Inc.*, 830 F.3d 735, 738 (7th Cir. 2016). Illinois law limits the circumstances in which a plaintiff may maintain an action for conversion.

For money, the general rule is that conversion will not lie if the value is represented by a general debt or obligation. *Sutherland v. O'Malley*, 882 F.2d 1196, 1200 (7th Cir. 1989) (citations omitted). "Only if the money at issue can be described as 'specific chattel'-- in other words, 'a specific fund or specific money in coin or bills'-- will conversion lie." *United BizJet Holdings, Inc. v. Gulfstream Aerospace Corp.*, 318 F. Supp. 2d 680, 681 (N.D. Ill. 2004). The plaintiff's right to the property must be absolute. In the case of money, a plaintiff must show that the money claimed *at all times* belonged to him and that the defendant converted it to his own use. *Horbach*, 288 F.3d at 978.

"Illinois courts do not recognize an action for conversion of intangible rights." *American Nat. Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir.2008). But negotiable instruments like checks are considered identifiable objects of property. *See McNichols v. Weiss*, 2018 WL 5778413, at *7 (N.D. Ill. 2018) (quoting *Great Lakes Higher Educ. Corp. v. Austin Bank of Chicago*, 837 F. Supp. 892, 897 (N.D. Ill. 1993) ("Illinois courts do recognize a cause of action for conversion of commercial paper, such as a check, on the theory that the intangible right is merged into the specific document.")) (citation omitted). Real property and intellectual property, such as a trademark, however, are not accepted subjects of conversion claims under Illinois law. *See Foodworks USA, Inc. v. Foodworks of Arlington Heights, LLC*, 2015 WL 1343873, at *2 (N.D. Ill. 2015); *see also Elesh v. Ocwen Loan Servicing, LLC*, 2013 WL 1707934, at *2 (N.D. Ill. 2013).

## B. Discussion

Count 1 of EF's amended complaint asserts a claim for conversion under Illinois common law related to its "money, intellectual property, mailing lists, real and personal property and . . . P.O. Box," stating that PSAE exercised dominion and control over these items "owned and/or possessed" by EF (Doc. 40, p. 11). But EF's right to the property must be absolute. PSAE alleges that ETF and EFELDF had ownership and use interest in these items, eliminating EF's ability to claim conversion because it did not have an absolute right to the property. EF does not answer this claim and instead disputes PSAE's contention that it is undisputed that PSAE never established any "control, dominion, or ownership" over items at issue. EF asserts that this dispute shows that there is a genuine issue of fact related to the conversion claim.

Regarding the mailing lists, PSAE's allegation questioning EF's absolute ownership and denying that it ever exercised any "control, dominion, and ownership" over the lists is enough to put the onus on EF to show that there is a dispute of material facts. EF does not respond to PSAE's question about absolute ownership and generally disputes PSAE's claim about not exercising ownership. EF's conclusory allegation without specific facts does not warrant a trial.

PSAE goes even further with the other conversion items. PSAE states that the conversion claim related to the money is improper because money is not an identifiable object of property. EF does not counter in any meaningful way, although it may have done so by alleging a specific fund or checks that were converted by PSAE. Even with all reasonable inferences in favor of EF, a general allegation of conversion of money without

facts is not a legitimate claim under Illinois law, and a reasonable jury would not render a verdict in its favor.

And so goes EF's claims for conversion of intellectual property; real property and personal property; and the post office box. PSAE alleges that conversion does not apply to intellectual property and real property along with stating that the personal property allegation was vague. PSAE further states that the post office box is government property, not EF's property. EF, again, does not really counter other than to dispute the vagueness of the personal property and the legal arguments made by PSAE.

EF appears to be confused on an important point: when the law on its face eliminates a plaintiff's claim no matter the material facts, any need for undisputed material facts dries as fast as EF's claim here. EF does not have a leg to stand on when it comes to these items because PSAE's defenses are not grounded in disputable facts based on elements. They are instead grounded in incontrovertible law using EF's own complaints. The personal property allegation does not specify whether the property is tangible. Real and intellectual property are not in fact legitimate claims for conversion, except for in some instances where they are connected to some tangible document, which has not been alleged here. Further bolstering this point, "trademarks are creatures of federal law [and] using state conversion law 'is the wrong tool for the job.'" *Foodworks USA, Inc.*, 2015 WL 1343873, at *2. Additionally, post office boxes are indeed rented, not owned, by customers who pay fees for the premium service on a semiannual basis. 39 C.F.R. § 41.3; *see also* United States Postal Service Domestic Mail Manual § 508.4.4.3. Thus, EF's conversion claim wholly fails.

## II. Lanham Act and Similar State Law Claims

### A. Applicable Law

"Congress passed the Lanham Act in 1946 to 'federalize' existing common law protection of trademarks used in interstate commerce." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 672 (7th Cir. 2001) (quoting *Peaches Enter. Corp. v. Repertoire Assocs., Inc.*, 62 F.3d 690, 692 (5th Cir. 1995)). "That law broadly prohibits uses of trademarks, trade names, and trade dress that are likely to cause confusion about the source of a product or service." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003). Under Section 32 of the Lanham Act, a defendant is liable for federal trademark infringement and counterfeiting if the defendant, (1) without consent, (2) used in commerce, (3) a reproduction, copy, or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion. *See* 15 U.S.C. § 1114(1)(a). Registration of a trademark allows the owner to sue an infringer under Section 32 and creates a presumption that the mark is valid. *See* 15 U.S.C. § 1057. In Illinois, the elements of federal trademark infringement under the Lanham Act mirror state unfair competition claims. *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1012 (N.D. Ill. 2014) (collecting cases).

Under Section 43(a) of the Lanham Act, a defendant is liable for false designation of origin if plaintiff (1) has a protectable mark; (2) connected with any goods or services used in commerce; (3) a false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact was made by defendant; and (4) the falsity is likely to cause confusion by another person. 15 U.S.C. § 1125(a)(1). The elements of a

claim for Illinois common law trademark infringement are the same as under 15 U.S.C. § 1125(a). *Poneman v. Nike, Inc.*, 161 F. Supp. 3d 619, 631 (N.D. Ill. 2016). The common thread in trademark infringement and unfair competition claims is that a plaintiff must allege "(1) that its mark is protectable, and (2) that the defendant's use of that mark is likely to cause confusion among consumers." *Phoenix Ent. Partners v. Rumsey*, 829 F.3d 817, 821 (7th Cir. 2016).

The Federal Trademark Dilution Act amended Section 43 in 1995 to add a cause of action for trademark dilution. *Doctor's Data, Inc. v. Barrett*, 2011 WL 5903508, at *7 (N.D. Ill. 2011) (quoting *Moseley,* 537 U.S. at 420). A defendant is liable for dilution if (1) a plaintiff has a famous mark; (2) defendant used the mark after it became famous; (3) the use caused dilution of the mark; and (4) the use was commercial and in commerce. 15 U.S.C. § 1125(c)(1). Illinois law similarly provides a remedy to the owner of a famous mark against another person's commercial use of a mark, if the use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. *Manley v. Boat/U.S., Inc.*, 75 F. Supp. 3d 848, 855 (N.D. Ill. 2014).

Section 43 was amended again in 1999, this time under the Anti-Cybersquatting Consumer Protection Act, to add a cause of action for cybersquatting. Cybersquatting is defined as the "bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." *Vulcan Golf, LLC v. Google Inc.*, 726 F. Supp. 2d 911, 915 (N.D. Ill. 2010). A defendant is liable for cybersquatting if a plaintiff proves that "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in

the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." 15 U.S.C. § 1125(d); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) (collecting cases).

**B. Discussion**

Counts 2, 4, and 6 of EF's amended complaint assert Lanham Act claims for trademark infringement under 15 U.S.C. § 1114 along with unfair competition and dilution under 15 U.S.C. § 1125. Counts 3, 5, and 7 of EF's amended complaint assert claims for Illinois common law trademark infringement, Illinois common law unfair competition, and Illinois statutory dilution. EF's amended complaint states that, without EF's consent, PSAE used in commerce a reproduction, counterfeit, copy, or colorable imitation of the "EAGLE FORUM" trademark in connection with its fundraising and solicitations of donations, as well as the sale, offering for sale, distribution, or advertising of goods or services, which likely caused confusion, mistake, or deception in violation of 15 U.S.C. § 1114(1)(a) (Doc. 40, p. 12). EF alleges that PSAE applied the mark to labels, signs, prints, and other promotional and marketing materials intended to be used in commerce upon or in connection with its fundraising and solicitations of donations, as well as the sale, offering for sale, distribution, or advertising of goods or services (*Id.* at 12-13).

EF also claims that PSAE has used in commerce words, terms, names, marks, symbols, devices, and combinations thereof and/or false designations of origin, which are likely to cause confusion, to cause mistake, and to deceive as to the affiliation,

connection, or association of itself with another person, as to the origin, sponsorship and approval of their goods and commercial activities by another person in violation of 15 U.S.C. § 1125(a)(1)(A) (Doc. 40, p. 15). EF alleges that PSAE used "American Eagles" in its marketing, including its website and in letters soliciting donations (*Id.*). EF further states that PSAE has used brands, names, and marks similar or identical to EF brands, names, and marks, including the "EAGLE FORUM" mark, which has had an adverse and deleterious effect on the value of the mark in violation of 15 U.S.C. § 1125(c)(1) (*Id.* at 16). EF further states that PSAE's usage deprives the mark of distinctiveness (*Id.*).

PSAE asserts that EF's claims of intellectual property-based legerdemain are flawed in several ways. PSAE states that the Lanham Act is not applicable to non-commercial political speech, citing cases outside of the Seventh Circuit that protect some claimed violations related to non-commercial subjects in expressive media on First Amendment grounds. EF counters that one case PSAE cites several times, *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 319 (4th Cir. 2015), cautions courts when applying the Lanham Act in non-profit circumstances and rejects an absolute rule in this area. *Id.* at 327. PSAE's argument brings up a salient question about what qualifies as commercial speech and what does not for the purposes of the Lanham Act. *Radiance* admits that the "goods or services" element of trademark infringement "remains a broad and potentially fuzzy concept." *Id.* at 324. This First Amendment argument is a very shiny hook, but one that this Court will not be baited into taking when there is an absence of controlling case law in this Circuit on the issue, and it is unnecessary to rule through the prism of

constitutional law. *See Eastland Music Group, LLC v. Lionsgate Ent., Inc.*, 707 F.3d 869, 871 (7th Cir. 2013) ("... courts should avoid unnecessary constitutional adjudication").

As an initial matter, PSAE claims that "American Eagles," "Our Eagle Leaders," "my American Eagle leaders," "loyal supporters," and "Phyllis Schlafly's Eagle Forum," which it surmises are the phrases EF aims to protect under common law trade mark infringement and § 1125(a), are not actually protected marks and not exclusive to EF. PSAE specifically brings up the generic nature of "loyal supporters," emphasizing that phrase as particularly problematic. EF responds by spilling considerable ink attacking PSAE for using what information it had available to determine what marks EF was referring to in its amended complaint. EF should have spent more time answering PSAE's pointed issues with its allegations as opposed to being evasive. Instead, it essentially forfeited its common law infringement and § 1125(a) argument.

PSAE next states that EF's claim on the § 1114 count falters because there is a lack of confusion in the marketplace. Congress placed upon the party claiming infringement the burden of proving the likelihood of confusion. *KP Perm. Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 111 (2004). EF must establish that PSAE's use of its "EAGLE FORUM" mark in the market is likely to cause confusion among consumers. To determine likelihood of confusion, the Court considers "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another." *AutoZone, Inc. v. Strick*, 543 F.3d

923, 929 (7th Cir. 2008). No factor by itself is dispositive, and courts may assign weights to each factor depending on the facts, but usually the similarity of the marks, the defendant's intent, and actual confusion are particularly important. *Id.* Confusion about the origin of a defendant's products or services is ultimately a question of fact. *Id.* That question may be resolved here only "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Id.* (quoting *Packman v. Chicago Trib. Co.*, 267 F.3d 628, 637 (7th Cir. 2001)).

The first factor instructs the Court to compare EF's mark, "EAGLE FORUM," to the PSAE's purported offending mark, "Phyllis Schlafly's American Eagles," in their entirety. *AutoZone, Inc.*, 543 F.3d at 930 (quoting *Estate of Beckwith, Inc. v. Comm'r of Patents,* 252 U.S. 538, 545–546 (1920)). The question becomes whether the viewer of the purported offending mark would associate the connected service with the source of services with which the other mark is connected. *Id.* In the case at hand, the phrases have a different word count and share the word "Eagle," though singular in one phrase and plural in the other. PSAE claims that the word "Eagle" was used broadly to refer to Schlafly and her operation without regard for the different legal entities. As proof that "Eagle" was never meant to be specifically associated with just EF, PSAE states that Schlafly created ETF earlier than EF, showing that it was a word she wanted to use amongst her entities. EF attempts to avoid this determination by stating that PSAE flipped the burden to EF, however, it seems to this Court that PSAE brought a cogent argument to the table that EF refused to address, shirking its burden based on the basic fundamentals of summary judgment caselaw in seminal cases such a *Celotex*. Plainly

stated, the marks don't appear to be similar as a whole, and, even picked apart, the common word "Eagle" appears interchangeable amongst many Schlafly related organizations. PSAE does not address any actual evidence of confusion in its brief, nor does it address the intent of PSAE, which for its part claims that it never intended to divert customers. Reduced to brass tacks, EF's § 1114 and common law unfair competition claims do not pass muster.

PSAE also attacks dilution based on EF's § 1125(c)(1) count and Illinois statutory law count, asserting similar arguments regarding the proprietary and distinctive nature of the alleged marks. PSAE states that the "EAGLE FORUM" mark is non-commercial, and incapable being diluted because the word "Eagle" was used amongst Schlafly's many entities and to refer to supporters. EF defers to its previous arguments on the subject. The purpose of a dilution suit is to protect the owner of the trademark from the eroding of the unique and prestigious aspects of a trademark caused by a proliferation of borrowings, that while not degrading the mark itself, are so numerous as to steal the mark's uniqueness. *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) (quoting *Illinois High School Ass'n v. GTE Vantage Inc.*, 99 F.3d 244, 247 (7th Cir.1996)). Under § 1125, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."

"It is not easy for a mark to qualify for dilution protection." *Manley*, 75 F. Supp. 3d at 858. Dilution "is to be applied selectively and is intended to provide protection only to those marks which are both distinctive and famous." *Id.* (quoting Senate Judiciary

Committee Report on S. 1883, S.Rep. No. 100–515, at 41–42 (Sept. 15, 1998)). The Court has addressed the lack of distinctiveness of the alleged marks and their multi-source use amongst Schlafly's entities. This same analysis eliminates EF's dilution arguments not only for the terms "American Eagles," "Our Eagle Leaders," "my American Eagle leaders," "loyal supporters," and "Phyllis Schlafly's Eagle Forum," but also "Eagle Forum" because of Schlafly's use of the term "Eagle" amongst the various entities, which whittles down its distinctive nature as a mark. Therefore, EF's dilution claims collapse.[1]

Lastly, under Count 8, EF claims that PSAE, in bad faith to redirect traffic and profit, registered infringing websites that were identical, confusingly similar, or dilutive to the "EAGLE FORUM" mark and its own website, knowing that EF had established the mark. Both parties agree that the domain names in question registered by PSAE are http://www.psamericaneagles.org and http://www.psamericaneagles.com. PSAE argues that there is nothing confusingly similar or dilutive about its domain names when compared to the "EAGLE FORUM" mark or EF's domain name, http://www.eagleforum.org. EF does not address this, instead focusing on the bad faith intent of PSAE. The Court agrees with PSAE. Had PSAE registered the "eagleforum" domain name with a different top-level domain, like .com or .net; altered the spelling of the name; made one or both of the words comprising the name plural; or used some

---

[1] Additionally, when Congress created the antidilution provision to the Lanham Act in 1995, it specifically adopted an exception for noncommercial use of a mark. *Moseley*, 537 U.S. at 430. This non-commercial exception has been interpreted by other Circuits to exclude alleged violators from the dilution provision unless the speech was purely commercial. *See Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002).

combination of these as a form of redirection to its site, one could see a confusing or dilutive aspect to the registry. What PSAE did is quite different, though. It registered a variation of its own name, which this Court has already found does not offend EF's mark. Consequently, EF's cybersquatting claim fizzles.[2]

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant PSAE's Motion for Summary Judgment (Doc. 202). PSAE's Motion for Contempt (Doc. 229) is **DENIED** as moot, and this entire action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED:   April 1, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

---

[2] Because the Court has granted summary judgment for PSAE on the entirety of EF's claims, a lost profits analysis in the context of summary judgment is unnecessary.